STANLEY A. GOLANTY, LORRIEE M. GOLANTY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10325–76.     Filed June 5, 1979.

*Jeffrey L. Davidson* and *William K. Carr*, for the petitioners.
*Charles O. Cobb*, for the respondent.

SIMPSON, *Judge:* The Commissioner determined deficiencies in the petitioners' Federal income taxes of $12,180 for 1972 and $9,031 for 1973. The only issue for decision is whether the petitioners' Arabian horse-breeding operation was an "activity

* * * not engaged in for profit" within the meaning of section 183(a) of the Internal Revenue Code of 1954.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Stanley A. Golanty and Lorriee M. Golanty, husband and wife, maintained their legal residence in Long Beach, Calif., at the time they filed their petition in this case. They filed their joint Federal income tax returns for 1972 and 1973 with the Internal Revenue Service, Fresno, Calif. Mrs. Golanty will sometimes be referred to as the petitioner.

The petitioner was born and raised on a farm in Iowa. She obtained her first experience in handling and riding horses when, as a youngster, she helped her grandfather gather the cattle on their farm. The petitioner obtained a bachelor's degree in biological science from Long Beach State College (Calif.) in 1964. She has done postgraduate work in anatomy, physiology, and chemistry, although she has not completed her master's degree. The petitioner also took a course in equine sciences at the University of California at Los Angeles. She is licensed with the State of California, and has a national license, as a medical technologist. Dr. Golanty, the petitioner's husband, is a medical doctor who practices medicine on a full-time basis.

After the petitioner received her bachelor's degree in 1964, she was unable to find a satisfactory position in her profession. Sometime in 1966, an acquaintance of Dr. Golanty informed him of an Arabian breeding stallion that was for sale. Dr. Golanty had just inherited some money, and he and the petitioner discussed the possibility of buying the horse. The horse was a 5-year-old Arabian stallion name Tazzrouf. The petitioner and Dr. Golanty went to see Tazzrouf and to talk to the owner, Sam Whitney. The petitioner was somewhat hesitant to purchase Tazzrouf because she did not have experience in handling a stallion. She was allowed to work with the horse for 3 weeks, and thereafter, she decided to purchase him. Tazzrouf was standing at stud, and the petitioner worked out an arrangement with Mr.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.

Whitney to leave the horse with him and to share the fees for the stud services.

Since Mr. Whitney's facility was not patronized by the best clientele in the horse business, he suggested that the petitioner enter Tazzrouf in public horse shows to expose him to a better class of horse breeders and thereby increase his marketability as a stud. He showed her how to prepare a horse for the show ring, explained the details of transporting a horse to a show, and introduced her to Margaret Haverstock. Ms. Haverstock's occupation was that of a swimming teacher. At the time the petitioner was introduced to her, she was an amateur horsewoman who intended to become a professional at showing horses. Ms. Haverstock owned a son of Tazzrouf which she was showing and promoting, and she agreed to show Tazzrouf for the petitioner. She did not receive compensation for her services, since she could not receive a salary and maintain her amateur status, but the petitioner reimbursed her for expenses, fees, and meals.

The petitioner prepared Tazzrouf for a show in Santa Barbara, Calif., rented a trailer and took him there, and Ms. Haverstock showed him in the show ring. Tazzrouf placed sixth in the large stallion class, thus placing over an imported horse which had received a great deal of publicity. The petitioner was very pleased with his performance, since Tazzrouf was a domestic-bred horse. When Mr. Whitney learned how well the horse had done, he suggested that the petitioner hire a professional trainer who could work with Tazzrouf on a regular basis, and that she talk to Dan Weisen, who represented that he was trained in Vienna at the Spanish Riding School.

Mr. Weisen had a ranch in Walnut, Calif., which is about 30 miles from the petitioner's home in Long Beach. She visited Mr. Weisen's facility, saw that he had some horses of excellent breeding, and sometime in 1967, she decided to hire him to train and show Tazzrouf. Although Tazzrouf was already trained to be ridden under a saddle, Mr. Weisen was to train him in the various things a horse is required to demonstrate in a show, such as walking, trotting, and cantering. Since the petitioner had no experience in showing a horse, he was also to instruct her so that she would eventually be able to show the horse herself. She paid Mr. Weisen $150 per month for his services, which included his compensation for handling Tazzrouf at shows. The petitioner also paid the entrance fees of the horse shows and for transport-

ing the horse to the shows. Mr. Weisen primarily showed the horse as a driving horse, an English pleasure horse, and as a breeding horse. He also agreed to promote Tazzrouf to those who inquired about breeding services. The petitioner hoped that she would receive sufficient stud fees to defray the cost of the horse shows. At that time, the fee for breeding a horse was $300 to $350. However, the petitioner never received any breeding fees from Mr. Weisen, nor did he ever inform her that he had bred Tazzrouf.

After the petitioner moved Tazzrouf to Mr. Weisen's ranch, she went there every morning to make sure that he was working with the horse. Mr. Weisen suggested that the petitioner work with and ride other horses at his facility, even those that had never been ridden. He told the petitioner that it was a necessary part of her training to receive experience in handling horses at all phases of their development. She was thrown from a horse she was riding at the instruction of Mr. Weisen, and she broke a bone in her left hand. After she recovered from that injury, Mr. Weisen suggested that she learn how to jump horses. As a result of that experience, she broke her right hand.

After the petitioner became involved in breeding Arabian horses, she read some books on the subject and began her own library to increase her knowledge of Arabian horses and of the business aspects of her breeding operation. She read the "Horseman's Tax Guide" to help her manage the financial side of her venture, and she consulted general books about agriculture and cattle to learn the basic principles of animal care and diet. The petitioner learned the various methods of classifying Arabian horses. One method classifies the horse by the breeder's name, for example, a "Jones-bred" horse. Another method classifies the horse according to the origin of its breed, such as Polish-Arabian bred, or Egyptian-Arabian bred, or desert-Arabian bred. There is also a Blue List catalog method, which classifies horses according to the purity of their bloodline. The petitioner's stallion, Tazzrouf, was classified by another method, the line-bred method. More specifically, Tazzrouf was a Skowronek-line-bred horse. Skowronek was an Arabian stallion to which the line named after him can be traced. Those interested in Skowronek-line-bred horses concentrate the amount of Skowronek blood in their horses, even breeding dams and sires to their own offspring, and breeding brothers to sisters. When the

petitioner first embarked on her horse-breeding venture, she concentrated her program on Skowronek-line-bred and desert-line-bred horses.

In the course of her involvement in the breeding of Arabian horses, the petitioner corresponded with other horse breeders to acquire more knowledge about the breeding operation and about the particular horses which she wished to acquire for her program. Through such correspondence, she learned some information about Arabian horses that she could not find in books. In one instance, she learned about a defect called congenital immune deficiency which certain lines of Arabian horses transmit. The petitioner also became acquainted with a horse breeder, Jimmy Wrench, who informed her of some Skowronek-bred mares that were available for purchase, and he introduced her to the practice of studying a horse's pedigree before purchasing it for her breeding program.

In the latter part of 1967 or early 1968, the petitioner became interested in acquiring a mare. She went to look at some Skowronek-bred horses that Mr. Wrench was selling at his ranch in the Puget Sound area of Washington. Mr. Wrench inquired about and checked Tazzrouf's pedigree. He informed the petitioner that the dam of Tazzrouf was from a line that was known to produce blue-eyed offspring, considered a breeding defect by the Arabian Horse Registry. He, therefore, advised the petitioner to sell Tazzrouf and not use him in her breeding operation. Mr. Wrench had already sold all his horses before the petitioner's arrival, but he gave her the name of an individual who was selling a mare for $5,000. When she went to inquire about the mare, the owner offered her to the petitioner for $3,500. The mare, named J. B. Sofia (Sofia), was a 3-year-old Skowronek which was in foal at the time. The petitioner purchased Sofia and sent her back to California by a commercial transport company. She was then boarded with Tazzrouf at Mr. Weisen's ranch in Walnut. However, Sofia never delivered the foal she was carrying. Arabian mares have a difficult time in conceiving and bearing their young. It is not uncommon for a mare who is pregnant to suddenly abort the foal or "absorb" the foal. When a mare is said to absorb the foal, it is thought that the products of conception somehow breakdown and are reabsorbed into the mare's system. The petitioner suspected that Sofia's pregnancy was either aborted or absorbed.

When the petitioner learned that Sofia was not in foal, she decided to breed her to Tazzrouf. Mr. Wrench advised against such breeding because of Tazzrouf's questionable pedigree and his potential for producing blue-eyed offspring. However, the petitioner proceeded with the breeding because she wanted the money that a foal would bring. In 1969, Sofia gave birth to a filly, Tazzifa, who possessed the lesser qualities of her dam and sire. The petitioner subsequently learned through a horse breeder in San Jose, Lois Kinney, about a woman in Oregon who wanted to trade an older mare she owned for a filly. Her mare, Kabana, had a good pedigree and was in foal at the time. The petitioner decided to trade Tazzifa for Kabana because she estimated that it would take 3 to 4 years before she could breed Tazzifa.

In 1968, the petitioner sought to expand her breeding operation, and she purchased another stallion who was 2 years old named "Faddandy." The horse was predominantly an Egyptian-bred horse whose dam had some Skowronek lines in her. The petitioner then purchased another mare of Skowronek-Egyptian breeding, R-Rala. The mare had recently given birth to a foal, R-Peggio, and she was again in foal. The purchase price for R-Rala included the colt R-Peggio. After the petitioner purchased R-Rala, she sent the mare to her friend, Mrs. Kinney, intending to breed R-Rala, after she foaled, to a Skowronek-bred stallion Mrs. Kinney owned named "Raffdaan." The petitioner sent R-Rala to San Jose sufficiently before she was to deliver the foal to guard against any problems. However, the foal she was carrying either died at birth or right after birth. The petitioner paid to have a necropsy report done on the dead foal, but the veterinarian never informed her why it died. The petitioner wrote and asked the doctor for the report, but the veterinarian never responded. The petitioner never learned why R-Rala's foal died.

Toward the end of 1968, the petitioner became dissatisfied with Mr. Weisen's services, and she relieved him of his duties 1 week before the U. S. Nationals horse show, a show that Tazzrouf had qualified to enter by accumulating enough points in other horse shows. As a result, an amateur showed Tazzrouf in the Nationals.

The petitioner moved her horses from Mr. Weisen's facility, sent Tazzrouf to another ranch, and sent the other horses to a friend of hers. However, the petitioner's friend was unable to

care for her horses in the manner that she desired, and the petitioner decided to purchase a breeding facility of her own. She desired a place that was close enough to enable her to oversee it, but far enough from the city area so that taxes and maintenance would not be prohibitive.

In December 1969, the petitioner and her husband purchased some property in Hemet, Calif., for $50,000. The property had no house on it, but it did have some barns, a training ring, and a bullpen. The petitioner moved her horses to the property as soon as the details of the purchase arrangement were completed. At first, the petitioner's grandfather, grandmother, and brother moved to the facility to help care for and breed her horses. They lived in a water tower and shed that the previous owner had converted into living quarters. The petitioner's grandfather had been a farmer and horseman, but at that time, he was in his seventies and wanted to retire. Her grandparents eventually purchased a home elsewhere and left the ranch, and her brother also eventually left her ranch.

The petitioner then decided to hire some personnel to help her operate the ranch, since she was unable to do all the work herself, and she hired a young woman, Lisa Warthen, who had a child. Ms. Warthen had virtually no experience in caring for horses. The petitioner could not afford to hire anyone who was fully trained and skilled in horse breeding. The petitioner taught her what to feed the horses, how to shovel manure, and instructed Ms. Warthen to call her if anything went wrong at the ranch. Ms. Warthen was not to breed the horses, nor help them when they were foaling; her only duties were to feed the horses in the morning and at night, clean up after them, schedule any veterinary calls so that she could be there when the doctor or the ferrier arrived, and to call the petitioner if a mare looked ready to foal. The hours Ms. Warthen worked were flexible; the petitioner merely expected her to work 4 hours a day. Ms. Warthen received less than $100 per month for her services, but she was allowed to live on the premises. The petitioner paid for all the utilities and supplies that Ms. Warthen used. The petitioner regarded Ms. Warthen's job with her as one whereby she could supplement her income. She eventually released Ms. Warthen from her duties because she could not rely on her to be there when a mare was foaling. The petitioner later

hired another woman, Barbra Watkins, a school teacher, to help at the ranch.

The petitioner operated her horse-breeding activity at the ranch under the name "Golanty's Hamidbar Arabians." She usually went out to the ranch three times a week to assist her hired help with the chores. The Hemet ranch was 75 miles away from her home, and it took her 1½ hours to travel there. On alternate weekends when her help had time off, the petitioner took care of the ranch, and she continued this procedure for several years. Dr. Golanty accompanied her to the ranch on alternate weekends when he was not on call. He, too, helped with the chores, although he rarely rode the horses. The petitioner's two children also went to the ranch with her, but neither child was particularly fond of horses. The property had no recreational amenities, such as a swimming pool, and the television reception was poor because of a nearby mountain. Consequently, her children did not enjoy the Hemet ranch.

The petitioner also put several improvements on the Hemet property. She built a shelter, a checkstand, a breeding chute, and several fences. She also built a small house on the property for a cost of $13,000. The house had a kitchen, a living room with an eating area, a medium-size bedroom, a smaller bedroom, and a bathroom. When the petitioner went to the ranch on weekends, she stayed in the house. However, if a mare was foaling, she often slept in the barn.

The petitioner confronted various obstacles in developing her breeding herd. First of all, she had to abide by several requirements of the Arabian Horse Registry to be able to register her horses with that organization. At that time, the registry required that an Arabian mare not be bred before she was 3 years old. Thus, the petitioner had to wait until any mare that she acquired or produced was 3 years of age before she could put it in her breeding program.

The petitioner also experienced difficulties in her attempts to breed her horses. Some of her mares spontaneously aborted or "absorbed" their fetuses. Other mares experienced "pseudocyesis," a condition in which a mare which has been bred thinks she is in foal when in fact she has not conceived at all. Consequently, such mares were not receptive to repeat breeding attempts after the petitioner discovered that such mares were not pregnant. Other mares were simply not receptive to breeding by certain

stallions. Some of the petitioner's mares were not coming into foal easily, and consequently, the petitioner had those mares bred each day during their breeding periods. She tried to time the breedings at the right point in the mare's ovulation in an attempt to produce more fillies. In the Arabian horse business, fillies are considered more desirable because they are more valuable on the market. Since the gestation period for an Arabian horse is between 320 to 360 days, each mare can only produce one foal per year. Also, some of the petitioner's foals were prone to problems after they were born. One of her foals contracted a sickness called "navel ill," a problem which had to be treated immediately. As a result of all these difficulties, the petitioner believed that breeding estimates used by the thoroughbred industry were also applicable to the Arabian horse-breeding industry. Such estimates calculate that, in order to produce one live foal each year, it is necessary to have two mares of breeding age.

Sometime in the late sixties, the petitioner and Dr. Golanty made tracing studies of various living Arabian horses to determine those horses which carried the bloodlines in which they were interested. The study included the names of various horses, their American-Arabian registration numbers, and the names of their offspring. Some of the books the petitioner consulted in connection with this study included the Arabian Horse Registry and some Egyptian registration books. In the course of such study, the petitioner examined a horse's pedigree from both its dam and sire. In the United States, the pedigree of the sire of an Arabian horse is called its "top line," and the pedigree of the dam is called its "bottom line." The petitioner intended to use the results of her study to implement a breeding strategy. She wanted to breed her Skowronek mares to Egyptian stallions, and then breed the fillies resulting therefrom to a Skowronek-bred stallion. The petitioner thought that a horse with a bottom line of Egyptian breeding and a top line of Skowronek breeding produced a horse that was superior to a Skowronek-bred horse. She also hoped to use the results of her study to find both mares and stallions that would be acceptable in her breeding operation since she experienced difficulty in finding Skowronek mares whose bloodlines were pure.

In 1970, the petitioner sought to expand her breeding operation and acquire more mares. In such year, she purchased

another Skowronek-bred mare, J. B. Rachael (Rachael), which was a young horse and could not be placed in the breeding herd right away. In that same year, she also purchased an Egyptian-Blue List female, Ru Raa Mida, and an Egyptian-bred stallion, Ru Raa Llany. Then in 1971, she traded Tazzifa for Kabana; and in that same year, she sold Tazzrouf, since she no longer wanted to use him in her breeding program.

The petitioner thought she needed still more mares of breeding age, and in 1971, she purchased an Egyptian mare, R-Halana. She also decided to lease some brood mares, and in 1971, she leased two Egyptian-Skowronek mares, Raffharah and Tzareyna, from Edith King, a breeder whom Mrs. Kinney recommended to her. In 1972, the petitioner leased two Skowronek stallions, Raffdaan and J. B. Sokaris (Sokaris); and in 1973, she purchased an Egyptian stallion, Fa Serica, and a mare, Anchor Hill Anisa.

The petitioner continued with her breeding program, but she soon realized that she was producing only one foal for every two mares that she had at her ranch. In 1973, she then leased two more mares, Daanarah and Raff Dahli, from Mrs. King. The horses the petitioner purchased or leased during 1966 through 1973, their gender and line, if known, and their ultimate disposition (to the time of trial) are reflected in the following table:

| Horse | Year acquired | Gender | Line | Disposition |
|---|---|---|---|---|
| Tazzrouf | 1966 | Male | Skowronek | Sold 1971 |
| Sofia | 1967 | Female | Skowronek-Egyptian | Sold 1973 |
| Faddandy | 1968 | Male | Predominantly Egyptian | Sold 1976 |
| R-Rala | 1968 | Female | Skowronek-Egyptian | Sold 1976 |
| R-Peggio | 1968 | Male | Unknown (colt of R-Rala) | Sold 1969 |
| Rachael | 1970 | Female | Skowronek | For sale |
| Ru Raa Llany | 1970 | Male | Egyptian desert | Standing at ranch |
| Ru Raa Mida | 1970 | Female | Egyptian-Blue List | Died 1976 |
| Kabana | [1]1971 | Female | Skowronek | Sold 1975 |
| Tamarack RSI | [2]1971 | Male | Egyptian | Standing at ranch |
| R-Halana | 1971 | Female | Egyptian | Standing at ranch |
| Raffharah | [3]1971 | Female | Egyptian-Skowronek | Returned 1975 |
| Tzareyna | [3]1971 | Female | Egyptian-Skowronek | Returned 1975 |
| Raffdaan | [3]1972 | Male | Skowronek | Returned 1973 |
| Sokaris | [3]1972 | Male | Skowronek | Returned 1973 |

| | | | |
|---|---|---|---|
| Fa Serica ..............1973 | Male | Egyptian | For sale |
| Raff Dahli ...........[3]1973 | Female | Egyptian-Skowronek | Returned 1975 |
| Daanarah ............[3]1973 | Female | Egyptian-Skowronek | Returned 1975 |
| Anchor Hill Anisa ...1973 | Female | Unknown | Standing at ranch |

[1]Although the petitioner testified that she traded Tazzifa for Kabana in 1969, her 1971 Federal income tax return shows that she did not acquire Kabana until 1971.

[2]Although the petitioner testified that she purchased Tamarack RSI in 1976, her 1971 Federal income tax return shows that she acquired Tamarack RSI in 1971.

[3]Horse was leased from third party.

The petitioner concentrated on breeding her mares to produce foals that could be sold, since she needed an income to run the ranch. The foals born into the petitioner's herd from 1969 through 1977, their gender, dam, sire, and line, if known, and ultimate disposition (through 1978) are reflected in the table on page 422.

The petitioner advertised the horses that she had for sale in the national breed journals and in the horse show programs in her local area. The advertisements included the name of the horse, its date of birth, the representation of pedigree, its bloodline, and whether the horse was being sold as a pleasure horse or breeding horse. The petitioner advertised in such manner any horse she held for sale. In 1971, she sold Midbar Eroica through an advertisement for $2,800. In 1972, she sold Midbar Marc for $800 and Midbar Crescendo for $1,500. The petitioner recorded most of these sales transactions in a ledger which stated the name of the horse, the purchaser, any downpayment, and the balance that was due. With only a few exceptions, she also made out a contract of sale for each horse.

In 1973, the petitioner began looking for another ranch, since the Hemet area was fast becoming a retirement community and since the taxes in the area were rising in "quantum jumps." She put the Hemet property up for sale and began looking for another place in north-central California in the hope that the cost of maintenance and taxes would be lower. The petitioner wanted a ranch that could be used for both breeding horses and raising crops. She contemplated that any income from the crops would be used to defray the expenses of her horse-breeding operation. In 1973, she purchased 134 acres of land in Paso Robles, Calif., for $109,000. Paso Robles is about 250 miles north of the petitioner's home. Approximately 110 acres were suitable for agriculture, and after she purchased the property, she made an arrangement with a tenant farmer who planted safflower on

Foals Born into Petitioner's Herd from 1969 through 1977
and Ultimate Disposition (through 1978)

| Foal | Year born | Gender | Dam | Sire | Line | Year sold |
|---|---|---|---|---|---|---|
| Tazzifa | 1969 | Female | Sofia | Tazzrouf | Skowronek | 1971 (Traded for Kabana) |
| Midbar Eroica | 1970 | Female | Sofia | Tazzrouf | Skowronek | 1971 |
| Midbar Marc | 1971 | Male | Kabana | Unknown | Unknown | 1972 |
| Midbar Crescendo | 1971 | Male | Rachael | Ru Raa Llany | Egyptian-Skowronek | 1972 |
| Midbar Sylphide | 1972 | Female | Sofia | Raffdaan | Skowronek | 1976 |
| Midbar Odette | 1972 | Female | Rachael | Raffdaan | Skowronek | 1976 |
| Midbar Allegro | 1972 | Male | Raffharah | Ru Raa Llany | ½ Egyptian | 1973 |
| Midbar Escamillo | 1972 | Unknown | Unknown | Unknown (Egyptian) | ½ Egyptian | 1972 |
| Midbar Maestro | 1972 | Male | R-Rala | Raffdaan | Skowronek | For sale |
| Midbar Lakme | 1973 | Female | Rachael | Raffdaan | Skowronek | For sale |
| Midbar Bel Di | 1973 | Female | Unknown | Unknown | Unknown | Standing at ranch |
| Midbar Lucia | 1974 | Female | Daanarah | Unknown (Egyptian) | Egyptian-Skowronek | 1977 |
| Midbar Valkyrie | 1974 | Female | Unknown | Unknown | ¾ Egyptian-Skowronek base | 1978 |
| Midbar Legata | 1974 | Female | Raffharah | Ru Raa Llany | Egyptian-Skowronek | Standing at ranch |
| Midbar Mambrino | 1975 | Male | Ru Raa Mida | Tamarack RSI | Egyptian | 1976 |
| Midbar Piper | 1975 | Unknown | Unknown | Unknown | Unknown | 1976 |
| Midbar Tristan | 1975 | Male | R-Rala | Unknown | ¾ Egyptian-Skowronek base | For sale |
| Midbar Gizelle | 1975 | Female | Unknown | Unknown | Unknown | Standing at ranch |
| Midbar Calyspo | 1976 | Female | Ru Raa Mida | Unknown | Blue List | For sale |
| Midbar Chamade | 1976 | Female | Rachael | Unknown | ½ Skowronek | 1978 |
| Midbar Faust | 1977 | Male | Unknown | Unknown | Blue List | For sale |
| Midbar Aurora | 1977 | Female | Unknown | Unknown | Unknown | Standing at ranch |

the land. The petitioner's share of the income from the crop was $4,000 to $5,000 the first year.

Although the Paso Robles property had a house on it, it had no facilities for horses. There was a wooden barn that was about 70 years old, but the petitioner felt the barn was unsuitable for her horses. Therefore, she built horse facilities on the property which consisted primarily of a portable barn and fencing. The petitioner expended about $20,000 for improvements at the Paso Robles ranch. Such amount included the cost of knocking down some old structures and constructing a road on the property.

The petitioner arranged to have some friends, who also bred horses, live in the house on the property in exchange for caring for her horses, looking after the house, and helping her and Dr. Golanty build the structures that were needed. She also agreed that her friends could keep their own horses at the ranch.

At the end of 1974 or the beginning of 1975, the petitioner arranged, through a real estate firm, to lease the Hemet land with an option to purchase to a man who claimed to be in the thoroughbred horse business. The lease was for a 2-year period at a rental of $300 or $350 per month. However, such arrangement did not work out, and the petitioner eventually contracted to sell the Hemet property in September 1977 for $120,000.

In the early years of her horse-breeding operation, the petitioner entered her horses in shows. In particular, she showed Tazzrouf a great deal because she was promoting him as a stud at that time. After 1970, the petitioner reduced showing her horses because most of her mares were in production and because someone told her that the Internal Revenue Service would disallow her horse-breeding expenses if she continued to show her horses. However, in the case of any horses that she did prepare for the show ring during the later years of her operation, she sent them to a professional trainer, Don Beekman. She paid him a flat fee which included an amount for boarding and training.

In the course of carrying on the breeding operation, the petitioner kept a monthly ledger to record her expenses, and such books were reviewed by her accountant at the end of each year. The items recorded by her included amounts for training fees, show expenses, advertising, boarding fees, health care for the horses, and repairs and maintenance at the ranch. During the years 1967 through 1973, the petitioner also expended

amounts for taxes and interest in connection with operating her ranch. The following table is a summary of the revenue, expenses, and losses generated by the horse-breeding operation, as stipulated to by the parties:

| Year | Revenue[1] | Taxes | Interest | Depreciation | Other expenses | Loss |
|---|---|---|---|---|---|---|
| 1967 | $38 | --- | --- | $1,169 | $5,855 | $6,986 |
| 1968 | 669 | $113 | --- | 2,360 | 7,284 | 9,088 |
| 1969 | 1,062 | --- | --- | 2,620 | 7,203 | 8,761 |
| 1970 | 1,105 | 1,111 | $2,896 | 6,127 | 10,691 | 19,720 |
| 1971 | 1,011 | 1,430 | 3,023 | 7,942 | 15,016 | 26,400 |
| 1972 | [2]461 | 1,058 | 1,237 | 8,492 | [2]19,555 | [2]29,699 |
| 1973 | 501 | 1,424 | --- | 9,708 | 18,267 | 28,898 |
| Total | 4,847 | 5,136 | 7,156 | 38,418 | 83,871 | 129,552 |

[1]The figures in this column do not include an additional $23,291 the petitioners received from the sale of horses and foals during such years. The proceeds of such sales were reported on their returns.

[2]The parties stipulated to the figures set forth in the table. However, on their 1972 income tax return, the petitioners reported a loss of $26,199, and income of $3,961, taxes of $1,058, interest of $1,237, and depreciation of $8,492. When such figures are netted, they result in other expenses of $19,373.

The following table reflects the horses standing at the petitioner's ranch as of the time of trial, their gender, and line, if known:

| Horse | Year acquired | Gender | Line |
|---|---|---|---|
| Ru Raa Llany | Purchased 1970 | Male | Egyptian desert |
| R-Halana | Purchased 1971 | Female | Egyptian |
| Tamarack RSI | Purchased 1971 | Male | Egyptian |
| Midbar Bel Di | Born 1973 | Female | Unknown |
| Anchor Hill Anisa | Purchased 1973 | Female | Unknown |
| Midbar Legata | Born 1974 | Female | Egyptian-Skowronek |
| Midbar Gizelle | Born 1975 | Female | Unknown |
| Midbar Aurora | Born 1977 | Female | Unknown |

On their Federal income tax returns, the petitioners deducted losses of $26,199 in 1972 and $28,898 in 1973, resulting from the operation of their Arabian horse-breeding activity. In his notice of deficiency, the Commissioner disallowed such losses because he concluded that the horse-breeding operation was an activity not engaged in for profit.

OPINION

The only issue to be decided is whether the petitioner's horse-breeding operation was an "activity * * * not engaged in for profit" within the meaning of section 183(a). Section 183(a) provides the general rule that if an individual engages in an activity, and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b)(1) provides that deductions which would be allowable without regard to whether such activity is engaged in for profit shall be allowed. Sec. 1.183–1(b)(1), Income Tax Regs. Section 183(b)(2) provides that deductions which would be allowable only if such activity is engaged in for profit shall be allowed "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Section 183(c) defines an activity not engaged in for profit as follows:

(c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.—For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

Section 183(d) provides that, in the case of an activity which consists in major part of the breeding, training, showing, or racing of horses, if the gross income derived from such activity exceeds the deductions for any 2 of 7 consecutive taxable years, then the activity shall be presumed to be engaged in for profit unless the Commissioner establishes to the contrary. Because the petitioner's horse-breeding enterprise has operated at a loss since its inception in 1966, such presumption is not in effect in this case.

The test for determining whether an individual is carrying on a trade or business so that his expenses are deductible under section 162 is whether the individual's primary purpose and intention in engaging in the activity is to make a profit. *Allen v. Commissioner*, 72 T.C. 28 (1979); *Dunn v. Commissioner*, 70 T.C. 715, 720 (1978); *Churchman v. Commissioner*, 68 T.C. 696, 701 (1977); *Jasionowski v. Commissioner*, 66 T.C. 312, 319 (1976); *Benz v. Commissioner*, 63 T.C. 375, 383 (1974). The taxpayer's expectation of profit need not be a reasonable one; it is sufficient if the taxpayer has a bona fide expectation of

realizing a profit, regardless of the reasonableness of such expectation. Sec. 1.183–2(a), Income Tax Regs.; *Mercer v. Commissioner*, 376 F.2d 708, 710–711 (9th Cir. 1967), revg. a Memorandum Opinion of this Court; *Dunn v. Commissioner*, *supra* at 720; *Churchman v. Commissioner, supra* at 701; *Benz v. Commissioner, supra* at 383; *Bessenyey v. Commissioner*, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967). The issue of whether a taxpayer engages in an activity with the requisite intention of making a profit is one of fact to be resolved on the basis of all the surrounding facts and circumstances of the case (sec. 1.183–2(b), Income Tax Regs.; *Allen v. Commissioner, supra* at 34; *Dunn v. Commissioner, supra* at 720; *Jasionowski v. Commissioner, supra* at 319; *Benz v. Commissioner, supra* at 382), and the burden of proving the requisite intention is on the petitioners (*Boyer v. Commissioner*, 69 T.C. 521, 537 (1977), on appeal (7th Cir., July 7, 1978); *Benz v. Commissioner, supra* at 382; *Johnson v. Commissioner*, 59 T.C. 791, 813 (1973), affd. 495 F.2d 1079 (6th Cir. 1974), cert. denied 419 U.S. 1040 (1974); *Sabelis v. Commissioner*, 37 T.C. 1058, 1062 (1962)).

Section 1.183–2(b), Income Tax Regs., sets forth some of the relevant factors, derived principally from prior case law, which are to be considered in determining whether an activity is engaged in for profit. *Boyer v. Commissioner, supra* at 537; *Benz v. Commissioner, supra* at 382–383. Such factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.

Although no one factor is determinative of the taxpayer's intention to make a profit (sec. 1.183–2(b), Income Tax Regs.), a record of substantial losses over many years and the unlikelihood of achieving a profitable operation are important factors bearing on the taxpayer's true intention. Sec. 1.183–2(b)(6), Income Tax Regs.; *Jasionowski v. Commissioner*, 66 T.C. at 322;

*Bessenyey v. Commissioner*, 45 T.C. at 274; *V. H. Monette & Co. v. Commissioner*, 45 T.C. 15, 47 (1965), affd. per curiam sub nom. *Monette v. Commissioner*, 374 F.2d 116 (4th Cir. 1967). As this Court stated in *Bessenyey v. Commissioner, supra* at 274:

> the presence of losses in the formative years of a business, particularly one involving the breeding of horses, is not inconsistent with an intention to achieve a later profitable level of operation, bearing in mind, however, that the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years.

The petitioner has learned a good deal about the breeding of horses, and she has devoted energy and time to the activity. Nevertheless, when we strip away all the talk, dig out the hard facts, and apply cold logic to them, we are convinced that the petitioner did not truly expect to make a profit from her horse-breeding venture, and that such activity was not potentially profitable and could not "recoup the losses which have meanwhile been sustained in the intervening years." *Bessenyey v. Commissioner, supra* at 274.

In this record, we have information concerning the operation of the ranch for a period of 7 years—1967 through 1973—and in each of those years, the petitioner incurred a substantial loss. Moreover, the losses generally increased over the years: in 1967, the loss was $6,986; but in 1972, it increased to $29,699, and in 1973, the loss was $28,898. For the 7 years, the losses totaled $129,552. A record of such large losses over so many years is persuasive evidence that the petitioner did not expect to make a profit. Sec. 1.183–2(b)(6), Income Tax Regs.; *Wiles v. United States*, 312 F.2d 574, 576 (10th Cir. 1962).

We are not persuaded by the petitioner's contention that the losses she sustained were merely symptomatic of the early years of any breeding operation. The petitioner testified that a horse-breeding operation needs two mares that are of breeding age in order to produce one live foal per year. She estimated that, as of the time of the trial in this case, in order to pay the expenses of a horse-breeding operation like her own and produce a profit, it would take three or four foals of very good quality per year. She also cautioned that, if some of these foals were colts, more foals would be required for the operation to be profitable. An analysis of the petitioner's operation shows that there was no possibility

of the operation being profitable in the years at issue and that there is no indication that it will become profitable.

By 1972, after the petitioner had been conducting the horse-breeding operation for 5 years, she had only 11 mares, and in 1973, she had only 10 mares at her ranch. We do not know whether all such mares were of breeding age. The average price the petitioner received on the sale of her foals during 1971 through 1977 was approximately $2,439. Thus, in the years 1972 and 1973, she could not expect to receive more than $13,000 per year from the sale of foals, and her costs of operation in each of those years exceeded $29,000. Moreover, at the time of the trial of this case in 1977, the petitioner had only four mares of breeding age. By reducing the number of productive mares, she has reduced the chances of the operation breaking even, and such a trend shows that there is no prospect that the operation will earn sufficient income to offset the past losses.

In 1978, the petitioner did sell two horses for $32,000, and she contends that such sales show that the operation has turned profitable. However, the prices obtained for the horses, $21,000 for Midbar Chamade and $11,000 for Midbar Valkyrie, far exceed any price that she received for any horse sold by her in the past. The highest price that she received in the past was $7,000 in 1976 for Midbar Mambrino. We have no evidence to indicate that the prices received in 1978 are representative and an indication of the prices that the petitioner could receive for the sale of other horses. Moreover, we have no evidence as to her costs in 1978. Consequently, those sales, without more, are insufficient to show that there has been a material change in the prospects for the petitioner and that she did in fact expect to make a profit on her horse-breeding operation.

The petitioner maintains that the relationship between her out-of-pocket expenses of carrying on the horse-breeding operation and the income of her and her husband shows that she would not have sustained such heavy losses unless she expected to make a profit. The regulations state that whether the taxpayer has other income and whether she has an independent means of support are factors to be considered in determining the profit motive of the taxpayer. Sec. 1.183–2(b)(8), Income Tax Regs.; see *Bessenyey v. Commissioner*, 45 T.C. at 275. The income of Dr. Golanty was substantial and was sufficient to enable them to maintain a comfortable standard of living notwith-

standing the losses from the horse-breeding operation. Moreover, section 1.183–2(b)(8) provides in part:

Substantial income from sources other than the activity (*particularly if the losses from the activity generate substantial tax benefits*) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved. [Emphasis added.]

Thus, in judging the effect of the losses, we must consider the tax benefit the petitioner expected to receive from the deduction of such losses.

In the operation of the horse-breeding enterprise, the petitioner incurred total expenses of $30,160 for 1972 and $29,399 for 1973, but her out-of-pocket expenses were only $21,668 for 1972 and $19,691 for 1973. On their Federal income tax returns, the petitioners deducted a loss of $26,199 in 1972 and a loss of $28,898 in 1973 from the operation of the breeding enterprise. The petitioner admitted that she and her husband received gross income of $84,211 in 1972 and $95,210 in 1973. Without the deductions for the losses from the horse-breeding operation, their taxable incomes for such years would have been subject to at least the 50-percent bracket. Although the deduction of such losses actually resulted in their incomes for the 2 years being subject to a lower bracket, we will assume that there was no change in bracket for the sake of simplicity. Thus, at least one-half of such losses, or $13,099 for 1972 and $14,449 for 1973, was a tax saving to the petitioners. When such savings are subtracted from her out-of-pocket expenses, the result is that the net "after-tax-benefit" expenditures were $8,569 for 1972 and $5,242 for 1973. In summary, if the petitioners are allowed to deduct the losses resulting from the horse-breeding operation, the actual burden on them is relatively slight; that is, the after-tax expenditure of $8,569 for 1972 represents only 10.2 percent of the petitioners' gross income of $84,211 in that year, and the after-tax expenditure of $5,242 for 1973 represents only 5.5 percent of their gross income of $95,210 in that year. Such burden is certainly not sufficient to indicate that the petitioner undertook the horse-breeding operation as a business from which she expected to make a profit.

The petitioner and her husband did sell the Hemet ranch for a profit, and she argues that such profit should be taken into consideration in determining whether the horse-breeding operation was carried on for profit. However, there is no evidence

indicating that the Hemet ranch was held with a view of subsequently selling it for a profit; particularly, there is no evidence that the petitioner ever contemplated that such ranch could be sold at a profit so as to defray some of the costs of operating the horse-breeding enterprise. In fact, the evidence suggests that the Hemet ranch was sold merely to reduce the costs of operation, not to realize a profit. These circumstances suggest that the sale of the Hemet ranch was a wholly independent activity and that the profit on its sale should not be taken into consideration in judging the petitioner's motive in conducting the horse-breeding operation. In any event, an analysis of the other economic aspects of her operation far outweigh any consideration we might give to this factor as establishing her profit motive. But see *Allen v. Commissioner, supra*.

Although the petitioner's horse-breeding enterprise had some of "the trappings of a business" (*Bessenyey v. Commissioner*, 45 T.C. at 274), such "trappings" are insufficient to demonstrate that the enterprise was a business carried on for profit. The petitioner kept a set of books to record the expenses of operating her horse-breeding venture, and she conducted the sale of her horses in an apparent businesslike manner. However, the keeping of books and records may represent nothing more than a conscious attention to detail. In this case, there has been no showing that books and records were kept for the purpose of cutting expenses, increasing profits, and evaluating the overall performance of the operation. The petitioner reviewed her records, but she has failed to show that she used them to improve the operation of the enterprise. Moreover, in part, the petitioner's records consisted of the pedigrees of her horses and their bloodlines. She registered her horses and recorded their bloodlines, as required by the Arabian Horse Registry. Yet, the keeping of such records relating to the pedigree and bloodlines of her horses is not indicative that she was in business for profit. Such activity is as consistent with a hobby as it is with a business.

Similarly, the petitioner's attempts to publicize her horse-breeding operation were not significant. At the outset, she entered her horses in some shows, and she had some success. She attempts to explain her abandonment of that program by claiming that she was told that such activity would cause the

IRS to challenge her deductions. Yet, if she were in fact in business, we are not convinced that she would have abandoned such an important means of publicizing her business on such an unsubstantiated report. Although she did do some advertising, it appears from the available evidence that such advertising was relatively insubstantial when compared to the overall costs of her operation. Such advertising may have been used merely as a means of selling the horses that she wished to dispose of; there is certainly not a consistent and concentrated program of advertising that would be expected of a person engaged in the business of raising horses for sale at a profit.

The petitioner contends that to reduce her losses, she shifted from the breeding of Skowronek to Egyptian-line horses and moved from the Hemet area to Paso Robles. However, we are not convinced that for the purpose of eliminating the losses, she made any meaningful changes in the method of carrying on the horse-breeding operation. She claims to have shifted to the Egyptian line in 1973, but Midbar Chamade, which was born in 1976, was one-half Skowronek. Such foal shows that the petitioner continued to breed her Skowronek-line horses at least until 1975 and casts doubt upon her claim. In addition, we are not persuaded that her move to the Paso Robles property is significant. She testified that her desire to move from the Hemet area was due to the "quantum jumps" in property taxes and other expenses of the operation. She indicated that she hoped the Paso Robles property would be suitable for some crop raising, thus producing another source of revenue for her horse-breeding venture. Yet, the income from such crops ranged from $3,000 to $5,000, and such income is insufficient to offset any significant portion of the losses resulting from the horse-breeding operation.

When the petitioner commenced the horse-breeding operation, she had no expertise in such activity. She had a bachelor's degree in biological sciences, but she had no particular knowledge of horses and their breeding. She conceded that her knowledge of the things she was called upon to undertake in the early days of her operation was miniscule: "I didn't even know how to put a horse into a show. I didn't know anything about transportation of the horse. I knew about cleaning them up and shovelling after them, and that was about it." Also, she knew little about the first horse that she purchased. In reference to Tazzrouf, her first

horse, the petitioner stated: "Well, they told me his sire and his dam which didn't mean a great deal to me, because I didn't know very much about pedigrees." When the petitioner did receive advice about improving her breeding stock, we observe that she disregarded such advice. For example, although Mr. Wrench informed her that Tazzrouf was from a line of Skowroneks which could produce blue-eyed offspring, considered a breeding defect in Arabian horses, she disregarded his advice and, in fact, bred Tazzrouf twice to Sofia because she wanted the money from the foals.

Moreover, with the exception of hiring Mr. Weisen to train Tazzrouf, and of hiring Mr. Beekman to train other horses she showed in recent years, we cannot accept the petitioner's contention that she hired trained personnel in her horse-breeding operation. She first employed an amateur, albeit one who intended to become a professional, to show Tazzrouf. When the petitioner became dissatisfied with Mr. Weisen and moved her horses from his facility, she had a friend take care of them at his ranch. Then, when the petitioner purchased the Hemet property, her grandfather and brother cared for the horses; later, she again hired amateurs, who according to her own testimony, "had little horse background." When she moved her operation to Paso Robles, she hired some friends, who also had horses, to maintain her horse venture in her absence.

Despite large and increasing losses, the petitioner never consulted any books nor any person who gave her advice regarding the business side of the operation. She did state that she consulted the Horseman's Tax Guide. The petitioner is an intelligent and energetic person, and she has acquired a good deal of knowledge about Arabian horses and their breeding. However, such activity and knowledge are altogether consistent with her interest in a hobby, and she has failed to show that she sought or acquired the expertise that would enable her to turn the horse-breeding operation into a profitable business.

In conclusion, after a careful review of all the facts and circumstances of this case, we hold that the petitioner's Arabian horse-breeding operation was an "activity * * * not engaged in for profit" within the meaning of section 183(a), since she did not

have a bona fide expectation of profit. Accordingly, the losses incurred by her during 1972 and 1973 are not deductible.

*Decision will be entered for the respondent.*