CLARA S. HIRES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hires v. Commissioner
Docket No. 10144-75.
United States Tax Court
T.C. Memo 1980-172; 1980 Tax Ct. Memo LEXIS 418; 40 T.C.M. (CCH) 342; T.C.M. (RIA) 80172; May 12, 1980, Filed *418 Held: Petitioner was not engaged in her writing and publishing activities for profit during the years 1970 through 1973. Accordingly, the losses sustained from such activities are not deductible. Held further: Petitioner is not entitled to deductions for medical expenses and tax return preparation expenses. Charles R. Merrill and Michael Guarglia, for the petitioner. Bernard S. Mark, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: Year
Deficiency
1970
$11,952.83
1971
7,582.89
1972
7,038.66
1973
9,965.07
After concessions, the remaining issues for decision are: (1) Whether petitioner's writing and publishing activities were activities not engaged in for profit within the meaning of section 183(a) [1]/; and *421 (2) If petitioner was not engaged in those activities for profit, whether she is entitled to certain deductions for medical expenses and tax return preparation expenses. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Clara S. Hires (hereinafter petitioner) resided in Millburn, New Jersey, when she filed her petition in this case. She timely filed her Federal income tax returns for the taxable years 1970 through 1973, inclusive, with the Internal Revenue Service. Petitioner was born in 1897 and has devoted most of her life to botanical research, specializing in ferns, spores and pollen cell structures. Petitioner developed her interest in this field while teaching science at a number of schools during the 1920's and early 1930's. During these years, petitioner pursued extensive education in both teaching and the general sciences. She received a B.A. degree from Cornell University in 1928 and took many other science related courses at various universities and colleges. Petitioner also obtained a degree from the Clarence White School of Photography, where she learned the technique of taking pictures through a microscope (photomicrographics). *422 In 1929, petitioner founded a nursery and research facility known as a Mistaire Laboratories (hereinafter Mistaire). At Mistaire, petitioner invented, developed and improved techniques for the propogation of ferns, orchids and other difficult plants. For almost forty years, until 1967 or 1968, petitioner regularly grew, advertised and sold seedlings, seeds and spores through national supply houses. Petitioner's income from Mistaire exceeded her expenses attributable thereto only once during those years. Initially, petitioner operated Mistaire out of her apartment in Summit, New Jersey. In 1932, petitioner expanded her operation by moving into her present house in Millburn. Her new facility consisted of a greenhouse, laboratory and two sterile culture rooms. From 1932 through 1965, petitioner employed at least two individuals in the operation of Mistaire. During the 1940's and 1950's, petitioner utilized her photomicrographic skills to research the structure of fern spores using a high powered microscope and camera. She prepared and supplied microscopic specimen slides to biological supply houses and accumulated a large collection of photomicrographs which precisely *423 detailed the structure of tern spores and related microscopic material. During those same years, petitioner wrote many articles and presented numerous scholarly papers at scientific symposiums concerning her research on ferns and spores. As a result of her work in this area, petitioner developed a prominent scientific reputation and her name and biographical summary appeared in several publications. In 1954, at the request of various individuals in the scientific community, petitioner decided to write and publish a five-volume series of books using her accumulated knowledge and photomicrographs to explain and illustrate the technique of identifying fern species through microscopic analysis of fern spores. Petitioner envisioned these books as a compilation of her extensive research and findings over the years. At the time she began writing the first volume of this series, petitioner expected to print 1,500 copies thereof. Petitioner devoted a substantial amount of time researching and writing volume I of "Spores-Ferns, Microscopic Illusions Analyzed" (hereinafter volume I). The book was finally published in December 1965, and was widely and favorably reviewed. Upon completing *424 volume I, petitioner immediately commenced work on volume II. From 1954 through 1965, inclusive, petitioner incurred expenses totaling $140,170.49 in connection with volume I. Petitioner capitalized these expenses and deducted them over a 60-month period beginning in 1965 pursuant to section 174 of the Code. Just prior to the publication of volume I, petitioner became seriously ill with cardiac and lung conditions attributable, in part, to a lifetime of working long hours in a sterile aseptic laboratory. Tests showed that petitioner had an obstruction in her pulmonary airways and emphysema combined with mild cardiac decomposition with bundle branch blocks. These conditions required constant medical care in the form of daily forced oxygen therapy. Petitioner continued to experience these severe health problems throughout the period at issue. Following publication of volume I, petitioner expended the following amounts for newspaper and magazine advertising and for the promotion of volume I at various scientific exhibits. Year
Amount
1966
$ 8,223.00
1967
12,115.00
1968
9,857.00
1969
7,804.00
1970
3,355.00
1971
2,438.00
1972
666.00
1973
247.00
1974
334.00
1975
103.00
*425 Petitioner also promoted the sale of volume I in the course of her regular correspondence with botanists throughout the world. The cash sales and distributions of volume I through July 1978, totaled 518 copies, detailed as follows, of which approximately 400 copies were sold for the full list price of $22,50 each plus postage. [2]/ Year
Number of Copies
1965
92
1966
110
1967
90
1968
60
1969
56
1970
35
1971
29
1972
19
1973
5
1974
3
1975
4
1976
5
1977
5
1978
5
Total
518
Beginning in 1966, petitioner concentrated on researching and preparing volume II for eventual publication. At that time, she hoped to complete that volume by 1968. Petitioner's efforts to achieve that goal, however, were severely hampered by her rapidly declining health which greatly reduced her productivity. She tired more easily than in the past and had frequent breathing problems. Her vision and hearing had also begun to deteriorate. Petitioner was often only able to work one hour or less a day. By 1969, petitioner's physical condition had deteriorated *426 to the point were her physician urged her to employ a companion to cook, clean and generally care for her daily living needs. Petitioner finally completed volume II in 1978. At the time of trial, it was in the process of being bound for publication. Through December 31, 1976, at least 120 purchasers of volume I had expressed written interest in future volumes of petitioner's work. Some purchasers of volume I had placed standing orders for future volumes while others had requested notification as to the publication date of those works. Since 1965, John F. Olsen, Jr. (hereinafter Olsen), president of Olsen Press, Inc., has served as petitioner's printing advisor on volumes I and II. In this capacity, Olsen reviewed the type, drawings and photographs that were sent to the printer Meriden Gravure Company. Olsen also made specific recommendations for reducing the costs of printing volume II. Moreover, based upon the sale of volume I, Olsen advised petitioner to initially print 500 copies of volume II. Petitioner maintained complete and accurate books and records of her publishing, nursery and personal activities. She employed several individuals to assist her in those activities. *427 From 1970 through 1973, Madeline Jarvis and Lena Johnson performed general bookkeeping and secretarial work in connection with volumes I and II. Other individuals, on both a full-time and part-time basis, helped petitioner assemble her research for reproduction by the printers. During these years, petitioner also employed a housekeeper, Bridgette McDermott, and a handyman, Norman Colwell. Aside from their regular duties, these individuals helped administer oxygen to petitioner on a daily basis. During the years 1970 through 1973, inclusive, Lena Johnson maintained a daily diary of her activities as petitioner's employee. Madeline Jarvis maintained a similar diary during 1972 and 1973. The following is a summary of the revenue, expenses and losses attributable to petitioner's activities in connection with volumes I and II from 1965 through 1975. Revenue from
Year
Sales of Volume I
Expenses
Loss [3]
1965
$ 1,054
$ 14,886
$ 13,832
1966
2,835
16,854
14,019
1967
2,072
30,134
28,062
1968
1,367
24,324
22,957
1969
1,367
25,728
2 4,361
1970
891
27,338
26,447
1971
723
32,620
31,897
1972
458
28,504
28,046
1973
139
29,705
29,566
1974
136
27,395
27,259
1975
140
22,130
21,990
Total
$11,182
$279,618
$268,436
*428 During the years 1938 through 1975, petitioner received income from trusts established by her father and brother. She also received income from dividends, interest and on the sale of stocks and bonds. This income was sufficient to enable petitioner to cover the expenses incurred in preparing volumes I and II, make capital improvements to her home and laboratory, maintain her overall standard of living and deposit the excess in a savings account. On her Federal income tax returns for 1970 through 1973 petitioner deducted the following losses arising from her writing and publishing activities: Year
Losses
1970
$40,459.71
1971
31,899.48
1972
28,047.63
1973
29,566.00
In his notice of deficiency, respondent disallowed these losses concluding that petitioner's activities were not engaged in for profit. OPINION We must decide whether petitioner's writing and publishing activities during the years 1970 through 1973 were activities *429 not engaged in for profit within the meaning of section 183(a). Section 183(a) provides that if an individual engages in an activity and if that activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided for by section 183(b). [4]/ Section 183(c) defines an activity not engaged in for profit as any activity other than one with respect to which deductions are allowable under section 162 or section 212(1) or 212(2). Section 162(a) allows a taxpayer to deduct all ordinary and *430 necessary expenses paid or incurred during the taxable year in carrying on a trade or business. The test for determining whether an individual is carrying on a trade or business under section 162(a) is whether that individual engaged in the activity with the primary purpose and intention of making a profit. Engdahl v. Commissioner,72 T.C. 659 (1979); Golanty v. Commissioner,72 T.C. 411 (1979). The taxpayer's expectation of making a profit need not be reasonable, but it must be bona fide. Golanty v. Commissioner,supra at 425-426; Dunn v. Commissioner,70 T.C. 715, 720 (1978). In the instant case, petitioner will not prevail simply by showing that she began her writing activities in 1954 with a profit objective. Instead, she must prove that she continued those activities during the years at issue with a bona fide intention and good faith expectation of making a profit. Engdahl v. Commissioner,supra;Churchman v. Commissioner,68 T.C. 696, 701 (1977). Section 1.183-2(b), Income Tax Regs., sets forth some of the relevant factors which are to be considered in determining *431 whether a taxpayer had the requisite profit motive. [5]/ The regulations further provide that no one factor is determinative and, thus, we do not reach our decision herein by merely counting the factors which support each party's position. Sec. 1.183-2(b), Income Tax Regs.; Dunn v. Commissioner,supra at 720. The issue is to be resolved on the basis of all the facts and circumstances with greater weight given to objective facts than to petitioner's mere statement of her intent. Engdahl v. Commissioner,supra;sec. 1.183-2(a), Income Tax Regs. After carefully considering the facts in this case, we conclude that petitioner did not have a bona fide expectation of profit during the years 1970 through 1973. *432 An examination of the record clearly reveals that petitioner did not conduct her activities in a business-like manner. Sec. 1.183-2(b)(1), Income Tax Regs. Although petitioner maintained complete and accurate books and records, she made no showing that she either kept or used those records for the purpose of cutting expenses or increasing profits. See Golanty v. Commissioner,supra.Petitioner even failed to show that she or any other individual reviewed these records to determine whether her activities were potentially profitable. Petitioner argues, however, that her attempts to market volume I demonstrated a business-like approach to her writing and publishing activities. We disagree. The record indicates that despite declining revenues from sales of volume I, petitioner sharply reduced her advertising efforts during the years at issue. No explanation, however, was offered for this action. Moreover, there is no evidence that petitioner adopted alternative marketing techniques or consulted with publishing or advertising agencies in an attempt to make her books more saleable. Accordingly, we cannot accept her contention that she actively prompted her *433 books during these years in an effort to make a profit. Petitioner also argues that to reduce her costs, she made changes in her methods of producing volume II. These included using an I.B.M. Selectric Compositor, eliminating hand-pasting of color photographs and placing black and white photographs at the end of a chapter rather than scattered throughout the book. We do not believe, however, that these few measures represented any meaningful change in petitioner's manner of conducting her activities. See Golanty v. Commissioner,supra. Each of the cited changes related to the physical printing of volume II, yet the record indicates that petitioner's printing costs were minimal in comparison to the overall costs of research, salaries, and other expenses. Petitioner failed to offer any evidence, however, showing that she even attempted to reduce those non-printing costs. Her entire testimony [6]/ on this point consisted of the statement "research is very expensive work." In view of these facts, we must conclude that petitioner's manner of operation belied an intent to make a profit. *434 We are also influenced by the fact that although petitioner was an acknowledged expert in her scientific field, her only previous writing experience had been of a non-commercial nature. In addition, there is no indication in the record that she knew anything about publishing. Yet, despite these facts, petitioner made no effort to study or obtain even a basic familiarity with the business side of her operation. From her testimony, it is apparent that she took little, if any, interest in the commercial aspects of her endeavors. When questioned about whether she cared if she did or did not make a profit she frankly admitted, "I don't give a damn what the figures are." Furthermore, while it is true that she often relied on the advice of Olsen, the record shows that his expertise was limited solely to the actual printing of books.He was not a publisher and did not offer expert opinions about marketing, advertising, pricing or other related concerns. Considering her own lack of expertise in these areas, we believe that petitioner's failure to consult with knowledgeable individuals about such important matters is indicative of a lack of profit motive. Cf. Benz v. Commissioner, 63 T.C. 375 (1974); *435 sec. 1.183-2(b)(2), Income Tax Regs.
Another factor supporting our decision is the magnitude and extent of petitioner's losses in connection with her publishing activities. Sec. 1.183-2(b)(6), Income Tax Regs. From 1954 through 1973, petitioner sustained losses totaling approximately $360,000. While this is not conclusive, a record of such substantial losses over so many years is persuasive evidence that petitioner lacked a bona fide expectation of profit. Golanty v. Commissioner, supra; Wiles v. United States, 312 F. 2d 574, 576 (10th Cir. 1962). Petitioner argues, however, that her declining health was an unforeseen and fortuitous circumstance which justified these continuous losses. We disagree. From the testimony of both petitioner and her physician, it is clear that she had been plagued by severe health problems since 1965. In 1969, her physical condition was such that she even required a companion to care for her basic living needs. Yet, notwithstanding these glaring physical disabilities, petitioner continued her publishing efforts incurring large losses in every year subsequent to 1965. Consequently, any suggestion that petitioner's *436 poor health was somehow an unforeseen circumstance during the years at issue is simply without merit. In our view, petitioner's losses were principally attributable to her failure to make a good faith appraisal of the potential for achieving a profit from her books. As of 1970, petitioner's expenses far exceeded the sporadic receipts generated by sales of volume I. Moreover, while those expenses had generally increased over the years, revenues had consistently declined. Based upon the lack of commercial success with volume I, Olsen recommended that petitioner only print 500 copies of volume II. Indeed, considering the relatively sparse number of advance orders for that edition, even this recommendation may have been overly optimistic. Yet, even assuming that petitioner could sell and 500 copies of volume II at fifty dollars each, [7]/ she still would not cover her current expenses which, since 1967, had been running in excess of $25,000 per year. Petitioner maintains that she expected volumes II-V to be profitable and to stimulate additional sales of earlier books *437 to cover her losses. Petitioner's testimony, however, reveals that she had absolutely no basis for this expectation. From that testimony, we are convinced that she gave little or no thought to whether those books would ever be profitable. Moreover, we note that it took petitioner ten years to complete volume I and another thirteen years to finish volume II. In view of her advanced age and deteriorating medical condition, we cannot believe that petitioner had a bona fide expectation of both writing and publishing five volumes and realizing sufficient earnings to recoup her prior losses. See Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F. 2d 252 (2d Cir. 1967); sec. 1.183-2(b)(7), Income Tax Regs.
In reaching our decision, we are certainly aware of the time and effort expended by petitioner in writing and preparing her books for publication. Petitioner, however, had always been interested in ferns and spores, having actively pursued this interest through lecturing, teaching and research for nearly fifty years. She freely admitted that science was her "greatest interest" and that she envisioned these books as a compilation of her *438 life's work. Her income from outside sources was not insubstantial and it afforded her the means of engaging in these activities, notwithstanding the continued losses generated therefrom. Benz v. Commissioner, supra at 385; cf. sec. 1.183-2(b)(8), Income Tax Regs. Accordingly, we are convinced that petitioner undertook and continued her writing efforts, not out of a good faith expectation of profit, but rather because of her love for botany and the personal gratification she derived from making her scientific work and accomplishments available to other dedicated researchers throughout the world. See, sec. 1.183-2(b)(9), Income Tax Regs.; Bessenyey v. Commissioner, supra; White v. Commissioner, 23 T.C. 90, 94 (1954), affd. 227 F. 2d 779 (6th Cir. 1955), cert. denied 351 U.S. 939 (1956). Issue 2: Medical Expenses and Tex Related Expenses
Petitioner's alternative argument is that the salaries paid to Norman Colwell and Bridgette McDermott are deductible as medical expenses under section 213(a).Respondent contends that those payments were nondeductible personal living expenses under section 262. *439 We agree with respondent. To be deductible as a medical expense under section 213, the expense must have been incurred primarily for the prevention of a 12 T.C. 580 (1949), affd. 183 F. 2d 579 (6th Cir. 1950). In this case, the record clearly establishes that Norman Colwell was hired principally as a handyman and Bridgette McDermott was hired as a housekeeper. Although both individuals performed some "nursing services" they were not employed principally to render such service. Accordingly, we must deny petitioner's alternative claim. Petitioner also argues that she is entitled to deduct a portion of the salary paid to Lena Johnson as an expense incurred in connection with the determination of her taxes. Sec. 212(3). She claims that since Lena Johnson devoted approximately one-half her time preparing petitioner's Federal income tax returns, one-half of the salary is deductible. Sec. 1.212-1(e), Income Tax Regs. We disagree. The only evidence offered by petitioner to substantiate this claim was various diaries prepared by Lena Johnson in the course of her employment. After reviewing these diaries, however, we cannot find adequate support for *440 petitioner's position. Accordingly, we must deny the deduction. To reflect the foregoing. Decision will be entered for the respondent.
Footnotes
1. /↩ All statutory references are to the Internal Revenue Code of 1954, as amended.
2. /↩ Petitioner made numerous gifts of volume I to family, friends, and various libraries.
3. The losses on petitioner's income tax returns for 1965-1970, inclusive, were actually larger than the figures above since they also reflected amortization of prepublication research and experimental expenses on volume I.↩
4. / Section 183(b). Deductions Allowable.--In the case of an activity not engaged in for profit to which the subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).↩
5. /↩ These include (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure of recreation are involved.
6. /↩ Petitioner was unable to appear at trial because of failing health. Her deposition, admitted into evidence, served as her testimony in this case.
7. /↩ Olsen testified that he advised petitioner in 1978 to charge fifty dollars for volume II.