MAYNARD M. and BARBARA A. LARSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Larson v. Commissioner
Docket No. 2696-84.
United States Tax Court
T.C. Memo 1986-542; 1986 Tax Ct. Memo LEXIS 60; 52 T.C.M. (CCH) 996; T.C.M. (RIA) 86542; November 12, 1986. Maynard M. and Barbara A. Larson, pro sese. Dean H. Wakayama, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner *63 determined deficiencies in petitioners' Federal income taxes and additions to tax under section 6653(a)(1)[1] for the taxable years 1980 and 1981 as follows: Addition to Tax
Taxable Year
Deficiency
Under Sec. 6653(a)(1)
1980
$3,916
$196
1981
5,622
281
The issues for decision are: (1) whether petitioners' breeding and selling of horses constituted an "activity not engaged in for profit" within the meaning of section 183; (2) whether petitioners are entitled to an investment tax credit for assets used in the horse breeding and selling activity; (3) whether petitioners are entitled to a residential energy credit for a fireplace insert; (4) whether petitioners are entitled to a casualty loss deduction for a horse barn destroyed by wind; (5) whether petitioners are entitled to a credit for child and dependent care expenses; and (6) whether petitioners are liable for the addition to tax under section 6653(a)(1). FINDINGS *64 OF FACT Some of the facts have been stipulated and are so found. The stipulated facts and exhibits attached thereto are incorporated herein by this reference. Petitioners, Maynard M. Larson and Barbara A. Larson, husband and wife, resided in Auburn, Washington, at the time they filed their petition in this case. Petitioners filed joint Federal income tax returns for the taxable years 1980 and 1981. During 1980, Maynard M. Larson (Maynard) was employed as a salesman by Duo-Fast Washington, Inc. (Duo-Fast), a distributor of Duo-Fast, Incorporated, which makes nails and staple guns sold to the construction industry. In September 1980, Maynard went to work as the local representative of Amerace Corporation (Amerace), selling high strength elastic nuts and bolts. He worked a minimum of 40 hours per week on these jobs and received approximately $19,850 and $21,200 as wages for the taxable years 1980 and 1981, respectively. On petitioners' Federal income tax returns his occupation was listed as "sales." Barbara A. Larson (Barbara) was employed by Coast-to-Coast Hardware and received approximately $7,200 and $9,200 as wages for the taxable years 1980 and 1981, respectively. Maynard *65 was born in North Dakota, raised on a farm and has always been around agriculture. He has been riding horses for approximately 32 years and has been roping calves and steers for about 20 years. Maynard has a degree in business administration. In 1969 and 1970 he served an apprenticeship with Don McMann, one of the largest paint horse breeders in the State of Washington. During his apprenticeship, Maynard learned to break and train colts. In 1973 petitioners purchased their residence and two and one-half acres of land. In 1978 petitioners purchased an additional three acres adjacent to their land for $10,000. On this five and one-half acres petitioners conducted the horse breeding and selling activity. During the taxable years in issue, petitioners conducted the activity under the name "Rocky Acres Ranch." In 1979 petitioners constructed a three stall barn on the property at a cost of $6,407 and purchased a horse trailer for $2,635. In 1980 petitioners made $1,453 worth of additions to the barn and in 1981 had a stud stall built at a cost of $1,246. [2]
*66 During the taxable years in issue, petitioners owned a paint mare named "Sweet Apache," which was acquired in 1974. Petitioners also owned a sorrel gelding quarterhorse named "Santana," acquired in 1975 for $550, and a bay gelding named "Norcho's Ringo," acquired in 1978 for $450. In 1980 petitioners purchased an Appaloosa gelding for $600. In 1981 petitioners purchased "I'm Ready," a quarterhorse gelding for $500. During the taxable years in issue, petitioners sold "Norcho's Ringo" and "Santana" for $1,150 and $1,500, respectively. They also reported boarding fees of $190 and income from roping events of $200 for the taxable year 1980 and boarding fees of $750 for the taxable year 1981. "Sweet Apache," petitioners' mare, was sold in 1982 for $3,500. During the taxable years in issue, petitioners owned two automobiles, a 1976 Ford LTD and a 1979 Ford pickup truck. The Ford LTD was purchased in January 1979 for $2,000. Barbara used it to commute to work and it was also used to tow petitioners' horse trailer to a local arena in the summer months. The pickup truck was purchased in June 1979 for $8,900. Maynard used the pickup truck to commute to work and in his jobs with *67 Duo-Fast and Amerace. He also used it in connection with the horse breeding and selling activity to haul grain and feed and to tow the horse trailer. On three occasions the pickup truck and trailer were used to transport some of the horses that petitioners' daughter used for her 4-H activities in 1981. In 1980 he was reimbursed approximately $1,056 by Duo-Fast for travel expenses. While employed by Amerace, he was given a company credit card to cover fuel expenses incurred at his job. During the taxable years in issue, petitioners did not maintain a travel log. The horse breeding and selling activity was conducted on a cash basis. When feed was purchased Maynard made a notation on a calendar. The majority of the other expenses Maynard paid by check and retained the cancelled check for record keeping purposes. Maynard did not maintain a separate bank account for Rocky Acres Ranch and did not advertise that any of the horses were for sale. Frank H. Dollar, Jr., petitioners' tax return preparer for the taxable years in issue, was the sole source of advice for the operating and budgetary plans pertaining to the activity. However, Mr. Dollar did not breed, raise, show, buy or *68 sell horses. On their Federal income tax returns, Schedule F, Farm Income and Expenses, petitioners claimed losses attributable to the horse breeding and selling activity for the taxable years 1978 through 1984 as follows: Year
Loss Claimed
1978
$6,749
1979
14,659
1980
10,680
1981
15,339
1982
2,428
1983
5,793
1984
3,750
However, petitioners' Federal income tax returns for the taxable years 1978, 1979, and 1980 as originally filed did not include the activity on Schedule F. Furthermore, during the audit of their Federal income tax returns for the taxable years 1978 and 1979, petitioners did not raise the existence of a Schedule F activity or other source of income. Frank H. Dollar, Jr., prepared petitioners' Federal income tax return for the taxable year 1981 and also prepared amended Federal income tax returns for the taxable years 1978 and 1979 and a "corrected" Federal income tax return for the taxable year 1980 to include the horse breeding and selling activity on Schedule F. On their amended Federal income tax return for the taxable year 1979, petitioners claimed an investment tax credit on the Ford LTD, pickup truck, horse trailer, *69 and barn. A portion of the credit, $340, was not utilized and carried forward to petitioners' "corrected" Federal income tax return for the taxable year 1980. Petitioners also claimed a residential energy credit of $212, for an energy efficient woodburning stove, which was not utilized and carried forward to the taxable year 1980. For the taxable years 1980 and 1981, petitioners deducted various expenses attributable to the horse breeding and selling activity. Petitioners depreciated the barn, stud stall, Ford LTD, pickup truck, horse trailer, and horses. The Ford LTD and pickup truck were depreciated based on 100 percent business use. Petitioners also deducted 100 percent of the insurance on the automobiles and for the taxable year 1980 deducted 100 percent of the insurance on their personal residence. They deducted a portion of their utilities, including water, electricity, garbage and sewer, and phone bill. In addition, they deducted the cost of dog food for their Doberman pinscher as a security expense. They also deducted the cost of having several trees trimmed and payment for house sitting. On both their original and corrected Federal income tax return for the taxable *70 year 1980 petitioners claimed a casualty loss of $2,840. The loss was claimed for a horse barn destroyed by wind during 1980. The horse barn was purchased by petitioners in 1973 along with the two and one-half acres of land. Petitioners filed a claim with Grange Insurance Association and received $5,700, the policy limit. The casualty loss claimed was the replacement cost in excess of the insurance reimbursement. Petitioners also claimed a credit of $64 for child and dependent care expenses. On their Federal income tax return for the taxable year 1981, petitioners claimed an investment tax credit of $279. The credit was claimed on a saddle, a horse, and the stud stall. The Commissioner, in his statutory notice of deficiency, determined that petitioners' horse breeding and selling activity was not engaged in for profit within the meaning of section 183 and accordingly disallowed petitioners' deductions attributable to the activity to the extent they exceeded income from the activity. The Commissioner also determined that petitioners were not entitled to an investment tax credit, a residential energy credit, a casualty loss deduction, or a credit for child and dependent care *71 expenses. In addition, the Commissioner determined that petitioners were liable for additions to tax under section 6653(a)(1). OPINION Activity Not Engaged in for Profit
Section 183(a) provides the general rule that, in the case of an activity by an individual not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided in section 183(b). Section 183(b)(1) provides that there shall be allowed those deductions that would be allowable without regard to whether the activity is engaged in for profit. See sec. 1.183-1(b), Income Tax Regs.Section 183(b)(2) provides that deductions that would be allowable if the activity were engaged in for profit shall be allowed to the extent that the gross income derived from the activity exceeds the deductions allowable under paragraph (1) of section 183(b). Section 183(c) defines an activity *72 not engaged in for profit as follows: (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. Section 183(d) provides that, in the case of an activity which consists in major part of the breeding, training, showing, or racing of horses, if the gross income derived from such activity exceeds the deductions therefrom for any 2 of 7 consecutive taxable years, then such activity shall be presumed to be engaged in for profit, unless the Secretary establishes to the contrary. Respondent has determined that the activity of petitioners was an "activity not engaged in for profit," and therefore, that petitioners' deductions for expenses incurred with respect to such activity must be limited in accordance with section 183(b). Petitioners argue that it should be presumed that the activity was engaged in for profit in accordance with section 183(d), and, in any event, *73 that they are entitled to all of the deductions claimed as attributable to the activity because they possessed the requisite intention of making a profit. Petitioners bear the burden of proof. Rule 142(a); Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Petitioners maintain that the operations of Rocky Acres Ranch should be presumed to be engaged in for profit in accordance with section 183(d). Petitioners contend that they engaged in the horse breeding and selling activity as of the taxable year 1978, so that the seventh taxable year of the activity refers to the taxable year 1984. Petitioners argue that if we ignore depreciation, the activity would show a profit for the taxable years 1982 and 1984 and consequently would have operated at a profit for 2 of 7 consecutive taxable years. Section 183(d) provides that the presumption applies if gross income derived from the activity exceeds the deductions attributable to such activity, determined without regard to whether such activity is engaged *74 in for profit. However, the statute does not provide an adjustment for depreciation in determining the profit. Cf. sec. 1.183-1(c)(2), Example (1), Income Tax Regs. Accordingly, we conclude that the presumption under section 183(d) is inapplicable. [3] However, the failure to qualify for this presumption does not give rise to any inference that the activity was not engaged in for profit. Sec. 1.183-1(c)(1), Income Tax Regs. Therefore, we must next consider whether petitioners engaged in the horse breeding and selling activity with the objective of making a profit. Petitioners maintain that they have operated Rocky Acres Ranch with the intent of making a profit, within the meaning of section 183. It is not necessary that the expectations of petitioners *75 of making a profit be reasonable, so long as they possessed a bona fide objective of realizing a profit. Sec. 1.183-2(a), Income Tax Regs.; Golanty v. Commissioner,72 T.C. at 425-426; Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967). We must determine whether petitioners possessed an "actual and honest profit objective," Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Whether petitioners had the requisite profit motive is a question of fact to be determined from all the facts and circumstances. Sec. 1.183-2(a), Income Tax Regs.; Golanty v. Commissioner,72 T.C. at 426. In resolving this factual issue, greater weight is given to objective facts than to petitioners' statements of their intent. Sec. 1.183-2(a), Income Tax Regs.; Engdahl v. Commissioner,72 T.C. 659, 666 (1979). *76 Section 1.183-2(b), Income Tax Regs., lists the following nine factors to be considered, along with all of the surrounding facts and circumstances, in determining whether an activity is engaged in for profit: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his or her advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits earned, if any; (8) the financial status of the taxpayer; (9) elements of personal pleasure or recreation involved in the activity. Applying these factors to the record herein, we conclude that petitioners' horse breeding and selling activity was an "activity not engaged in for profit" within the meaning of section 183(a). Petitioners contend that the manner in which Rocky Acres Ranch was conducted indicates an intent to make a profit. Petitioners introduced *77 into evidence a business plan which Maynard testified he formulated in 1978. He testified that it was a program to encourage investors to purchase horses that he would break and train. However, he further testified that no horses were purchased by investors under the business plan. Petitioners maintain that the records kept were adequate to reflect gross income and expenses. The activity was conducted on the cash basis and when feed was purchased Maynard made a notation on a calendar. The majority of the other expenses Maynard paid by check and, therefore, had a cancelled check for record keeping purposes. However, there has been no showing that books and records were kept for the purpose of cutting expenses, increasing profits, and evaluating the overall performance of the operation. Golanty v. Commissioner,72 T.C. at 430. In fact, there is nothing in the record to demonstrate that petitioners made any changes in operating methods in an effort to increase profitability. Maynard did not maintain a separate bank account and did not advertise that any of the horses were for sale. Furthermore, in the taxable year 1978, when petitioners contend that the activity *78 started, and in the taxable years 1979 and 1980, the activity was not shown on the original Federal income tax returns filed by petitioners. In addition, during the audit of their Federal income tax returns for the taxable years 1978 and 1979 petitioners did not raise the existence of a Schedule F activity. In light of these facts, we conclude that petitioners' manner of operation does not indicate an intent to make a profit. Petitioners also contend that the time and effort expended by Maynard support their position. During the taxable years in issue Maynard spent a minimum of 40 hours per week at his jobs with Duo-Fast and Amerace. Maynard testified that he devoted 4 hours a day during the week and from 6 to 10 hours on the weekend to the horse breeding and selling activity. Maynard's testimony regarding his daily routine was that in the mornings he would take the horses out, groom them, and turn them loose in a pen for free exercise. He would then clean out the stalls and feed the horses. If there was a show coming up, he would work the horse that he was going to show. In the evenings, the same routine was repeated. In addition, any maintenance required on the barn or *79 fences was done in the evenings. The fact that Maynard devoted a substantial amount of personal time and effort to carry on the horse breeding and selling activity may indicate an intention to derive a profit, particularly if the activity does not have substantial personal or recreational aspects. Sec. 1.183-2(b)(3), Income Tax Regs. Although he testified that he devoted 4 hours a day during the week and from 6 to 10 hours on the weekend in the pursuit of the activity, the material recreational element involved somewhat diminishes the importance and significance of this factor. Maynard was raised on a farm and has always been around agriculture. He has been riding horses for approximately 32 years and has been roping calves and steers for about 20 years. In 1981 some of the horses were used by petitioners' daughter for her 4-H activities.Furthermore, petitioners incurred these expenses without regard to their deductibility as evidenced by the fact that the expenses were incurred in 1978, 1979, and 1980 and not deducted on the income tax returns originally filed for those years. Petitioners further contend that their profit motive is evidenced by the *80 anticipated appreciation in the value of assets used in the horse breeding and selling activity, particularly the value of the barn and land. The barn was built in 1979 at a cost of $6,407 and petitioner testified that it was insured for $18,000. The land was purchased in 1978 for $10,000. Maynard testified that at the time of trial the value of the land, based on sales of properties in the area, was $60,000. However, petitioners failed to introduce any evidence to corroborate these valuations. We do not accept Maynard's conclusory and self-serving statements as fact. Another factor that weighs against petitioners is the history of losses incurred with respect to the horse breeding and selling activity. In each taxable year from 1978 through 1984 petitioners reported a net loss, in amounts ranging from approximately $2,400 to $15,300. Although losses in the initial years of an activity are not necessarily fatal to the section 183 determination, section 1.183-2(b)(6), Income Tax Regs., the ultimate goal of an activity engaged in for profit must be to realize *81 a net profit on the activity so as to recoup losses sustained previously. Bessenyey v. Commissioner,45 T.C. at 274. There is nothing in the record to indicate whether an investigation was made, prior to undertaking the activity, to determine the business viability, economic feasibility, and profit making potential of a horse breeding and selling activity. Furthermore, petitioners have not indicated any changes made in the activity over the period 1978 to 1984 that might have supported an intent to improve its profitability. For example, with respect to the breeding aspect of the activity, petitioners owned only one mare.Maynard testified that the mare was bred in 1980 but aborted the foal. Maynard further testified that the mare was bred again in 1981 and again she aborted the foal. There is nothing in the record to indicate if a foal was ever born to the mare. The mare was sold in 1982 and there is nothing in the record to indicate that another mare was purchased. With regard to the selling aspect of the activity, petitioners sold two horses during the taxable years in issue for a total selling price of $2,650. The two remaining horses, excluding the mare, *82 were not established to have substantial resale value. Petitioners also reported boarding fees of $940 and income from roping events of $200 during the taxable years in issue. Accordingly, it is difficult to imagine how petitioners expected to generate a profit. Furthermore, petitioners failed to produce any evidence that the activity would become profitable in the future. No projection of the activity's potential for profit or loss has ever been made. Petitioners contend that since they are in a low tax bracket the losses of the horse breeding and selling activity do not generate substantial tax benefits. Maynard testified that during the taxable years in issue they received a 15 to 20 percent tax benefit from the losses of the activity. They reason that consequently there is no real benefit to them in losing money. They contend that this indicates that the activity is pursued with a profit motive and not for tax benefits. Section 1.183-2(b)(8), Income Tax Regs., provides that substantial income from sources other than the activity (particularly if the *83 losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved. In Engdahl v. Commissioner,72 T.C. 659 (1979), we did not construe the regulation as providing that the existence of substantial tax benefits is an additional reason to deny a deduction. Instead, we said that "the concurrent existence of other income poses the question, rather than answers it." Engdahl v. Commissioner,supra at 670. Conversely, the lack of substantial tax benefits is not to be construed as indicative of a profit motive.Furthermore, it is a simple economic fact that "[a]s long as tax rates are less than 100 percent, there is no 'benefit' in losing money." Engdahl v. Commissioner,supra at 670. Upon review of the entire record, we conclude that the horse breeding and selling activity was an "activity not engaged in for profit" within the meaning of section 183.Accordingly, petitioners' deductions for expenses properly attributable to the activity are limited under section 183(b). [4]
*84 Investment Tax Credit
On their amended Federal income tax return for the taxable year 1979, petitioners claimed an investment tax credit on the Ford LTD, pickup truck, horse trailer, and barn. A portion of the credit was not utilized and carried forward to the taxable year 1980. On petitioners' Federal income tax return for the taxable year 1981, they claimed an investment tax credit on a saddle, a horse, and the stud stall. Section 38 provides a credit for investment in certain depreciable property. The credit is available for tangible personal property with respect to which depreciation (or amortization) is allowable. Sec. 48(a)(1)(A). Depreciation is allowable only for property used in a trade or business or held for the production of income. Sec. 167(a). A building and its structural components are not eligible for the credit. Sec. 48(a)(1)(B). Neither are horses eligible for the credit. Sec. 48(a)(6). Therefore, an investment tax credit cannot be claimed on the barn or horse. We have previously concluded that petitioners' horse breeding and selling activity was an *85 "activity not engaged in for profit." This is defined as any activity other than one with respect to which deductions are allowable under section 162 or under paragraph (1) or (2) of section 212. Sec. 183(c). Section 162 provides for deductions for ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Section 212(1) and (2) provides that in the case of an individual, there shall be allowed a deduction for the ordinary and necessary expenses paid or incurred during the taxable year for the production of income or for the management, conservation, or maintenance of property held for the production of income. As a result of our conclusion that this is an "activity not engaged in for profit," the property is not used in a trade or business or held for the production of income.Since depreciation is allowed only for property used in a trade or business *86 or held for the production of income, depreciation is therefore not allowable with respect to the property used in petitioners' activity. Accordingly, the Ford LTD, pickup truck, horse trailer, saddle, and stud stall are not eligible for the investment tax credit. Residential Energy Credit
On their amended Federal income tax return for the taxable year 1979, petitioners claimed a residential energy credit of $212 for an energy efficient wood burning stove. The credit was not utilized and carried forward to the taxable year 1980. Maynard, however, testified at trial that the credit was claimed on a fireplace insert. [5] He also testified that it was designed to fit their fireplace and was airtight and did not allow any of the heat from the central heating system to escape.
The residential energy credit is allowed for qualified energy conservation expenditures. Sec. 44C(a)(1). [6] Energy conservation expenditures are defined *87 as expenditures made on or after April 20, 1977, for insulation or other energy-conserving component installed on a dwelling unit. Sec. 44C(c)(1). The items which qualify as energy-conserving components are specifically set forth in section 44C(c)(4)(A)(i) through (vii). In addition, the Secretary is given authority to designate additional items as energy-conserving components. Sec. 44C(c)(4)(A)(viii). Included in the list of other energy-conserving components is a device for modifying flue openings designed to increase the efficiency of operation of the heating system. Sec. 44C(c)(4)(A)(ii). Section 1.44C-2(d)(4)(ii), Income Tax Regs., provides as follows: (ii) A device for modifying flue openings. The term "device for modifying flue openings" means an automatically operated damper that -- (A) Is designed for installation in the flue, between the barometric damper or draft hood and the chimney, of a furnace; and (B) Conserves energy by substantially reducing the flow of conditioned air through the chimney when the furnace is not in operation. *88 Conditioned air is air that has been heated or cooled by conventional or renewable energy source means. Petitioners contend that the fireplace insert is a device for modifying flue openings designed to increase the efficiency of operation of the heating system. However, they have not established that the fireplace insert is an automatically operated damper. Neither have they established that the fireplace insert is located in the flue, between the barometric damper or draft hood and the chimney, of their furnace. Accordingly, petitioners have not established that the fireplace insert is a device for modifying flue openings designed to increase the efficiency of operation of the heating system. Sec. 1.44C-2(d)(4)(ii), Income Tax Regs. Nor have they established that the Secretary has designated a fireplace insert as an energy-conserving component. Sec. 44C(c)(4)(A)(viii). Therefore, the expenses incurred do not qualify for the residential energy credit. Casualty Loss Deduction
On their Federal income tax *89 return for the taxable year 1980, petitioners claimed a casualty loss deduction of $2,840. The loss was claimed for a horse barn, purchased by petitioners in 1973, destroyed by wind during 1980. Section 165(a) provides that there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. In the case of an individual, the deduction under section 165(a) is limited by section 165(c) to losses incurred in a trade or business or in any other transaction entered into for profit or losses not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. The amount deductible is the lesser of the difference between the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty or the adjusted basis of the property. Helvering v. Owens,305 U.S. 468 (1939); sec. 1.165-7(b), Income Tax Regs.The fair market value of the property immediately *90 before and immediately after the casualty shall generally be ascertained by competent appraisal. Sec. 1.165-7(a)(2)(i), Income Tax Regs.
Petitioners have not established the value of the property before and after it was destroyed. Furthermore, petitioners have not provided any proof as to the adjusted basis of the property. The only evidence submitted was the estimated replacement cost of the property. Any amount calculated with reference to replacement cost would not in and of itself be a proper measure of any loss sustained by casualty. Accordingly, petitioners have failed to prove the amount of the loss sustained. Rule 142(a). Section 6653(a)(1) Addition to Tax
The final issue for decision is whether petitioners are liable for the addition to tax pursuant to section 6653(a)(1). [7]Section 6653(a)(1) applies where any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Petitioners bear the burden of proving that the determination of the negligence addition is erroneous. Rule 142(a). [7]
*91 Petitioners deducted depreciation and insurance attributable to the personal use of the automobiles. No attempt was made to allocate between asserted business activity and personal use. Petitioners were aware that allocation was required as evidenced by the allocation of their utilities and phone bills. Petitioners also deducted other personal expenses, such as the cost of trimming trees, house sitting, dog food, and insurance on their personal residence. Petitioners have failed to persuade us that respondent's imposition of such addition was unwarranted. Accordingly, we sustain respondent's determination with respect to the addition to tax pursuant to section 6653(a)(1). To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the relevant years, and all Rule references are to the Rules of Practice and Procedure of this Court.↩
2. The stud stall was classified as five-year property on petitioners' Federal income tax return for the taxable year 1981.↩
3. The record does not indicate that petitioners timely filed an election to postpone until the taxable year 1983 the determination of whether it should be presumed that, since the taxable year 1978, the horse breeding and selling activity was engaged in for profit. See subsections (d) and (e) of section 183↩.
4. In view of our resolution of the issue, we need not address the argument of respondent that petitioners did not substantiate their expenses attributable to the horse breeding and selling activity.↩
5. In Olson v. Commissioner,81 T.C. 318↩ (1983), we held that a wood burning stove was not eligible for the residential energy credit.
6. Section 44C was redesignated as section 23↩ by sec. 471(c)(1) of the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 826.
7. On their Federal income tax return for the taxable year 1980, petitioners claimed a credit of $64 for child and dependent care expenses as provided for in section 44A (section 44A was redesignated as section 21 by sec. 471(c)(1) of the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 826). Petitioners, however, failed to introduce any evidence at trial to substantiate the amount of the expenses incurred. Furthermore, they did not address the issue in their brief. We can only conclude that petitioners have conceded this issue.↩