T.C. Memo. 1999-167


UNITED STATES TAX COURT


JOYCE E. HASTINGS, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2032-97.                    Filed May 18, 1999.


Joyce E. Hastings, pro se.

Linas N. Udrys, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  Respondent determined income tax deficiencies and additions to tax for petitioner's 1986 and 1988 through 1992 taxable years as follows:

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) |
|------|-----------|-------------------|
| 1986 | $2,096 | $525 |
| 1988 | 351 | 88 |
| 1989 | 3,188 | 797 |
| 1990 | 10,816 | 2,704 |
| 1991 | 11,961 | 2,909 |
| 1992 | 5,801 | 1,448 |

After concessions by respondent,[1] the issues remaining for our consideration are: (1) Whether petitioner had unreported gross receipts for her 1986, 1990, and 1991 tax years; (2) whether petitioner's horse breeding activity was an activity not engaged in for profit within the meaning of section 183;[2] and (3) whether petitioner is liable for additions to tax under section 6651(a)(1) for the 1986, 1989, 1990, 1991, and 1992 taxable years.

FINDINGS OF FACT[3]

Petitioner Joyce E. Hastings had her legal residence in Huntington Beach, California, at the time her petition was filed in this proceeding. After attending Western State College of

_____

[1] Respondent conceded the disallowed Schedule C law practice expenses for 1988, 1989, and 1990. Respondent also conceded $7,400 of the $15,499 unreported gross receipts adjustment for 1990 and $5,080 of the $22,410 gross receipts adjustment for 1991.

[2] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the periods under consideration. Rule references are to this Court's Rules of Practice and Procedure.

[3] The parties' stipulation of facts and exhibits are incorporated by this reference.

Law, petitioner began practicing law in 1972, and she continued to practice during the years under consideration.  She specialized in family law, including the handling of divorces, separations, and child custody matters.

Petitioner, who is a diabetic, began experiencing additional health problems, including some lapses of memory, and in the mid-1980's she decided to curtail her legal practice and change to a different source of income.  From the time petitioner was 5 years old, she has been involved in and become familiar with training, breeding, and showing horses.  As a young woman, petitioner was successful in showing her family's horses.  After having little involvement with horses throughout college, law school, and during her practice of law, petitioner, in 1985, began to join saddlebred horse associations and to become more involved in horse-related activity.

During 1989, petitioner began her horse activity.  She visited farriers and horse farms during the period 1986 through 1989 to determine the ways to generate income from horse activity.  After considering the advice received, petitioner decided to purchase and/or breed a stud horse that would generate revenue.  She concluded that an approach involving the breeding of stallions would require the least amount of annual overhead and would generate income from stud fees.  Petitioner intended to show the stallions and any other horses of the same bloodline as

a means of advertisement and to enhance the worth of the stud service.  Although petitioner thought that some income could be generated from showing horses, she thought more could be earned from selling a stallion's stud services.

Petitioner decided to purchase a chestnut show horse with white markings to be bred with a palomino.  The particular type of show horses sought by petitioner were ones that show well in harness and also those shown as "park horses", which are saddled with a rider.  Petitioner sought out a horse from a bloodline of Will Shriver, who was one of the top two or three horses in his category.  Petitioner believed that the horse activity would be suitable for her because it required less memory skills and more physical involvement.

Before purchasing the first horse, petitioner consulted Saddle and Bridle magazine to determine how much money had been won by the progeny of the horses under consideration.  In July of 1989, she hired Bobby Morrison (Morrison), a well-qualified Kentucky horse expert, who, on petitioner's behalf, acquired Casablanca Chestnut Charm (Misty),[4] a yearling saddlebred, for a total cost to petitioner of $4,400.  Morrison was paid a 10-percent commission ($400) for his services.  Misty was shipped from Kentucky to California and was trained by Susan Haight of

_____

[4] The shortened names do not necessarily coincide with the formal names and are used by the owner as "stable names".

Victory Lane Stables.  During 1990, Susan Haight showed Misty at six different shows, and Misty received the "Best of Breed Fine Harness Two Year Old" award from Saddle & Bridle magazine.

Although Misty was a fine looking harness horse, upon reaching her third year she was not mature enough to become a saddle horse, and petitioner decided that it would be too expensive to show her as such because she did not have a good chance of winning a purse.  Petitioner hired a trainer to train Misty as a saddle horse, and after that failed, to train her with an antique carriage, and that also failed.  Attempts at breeding Misty were, for the most part, unsuccessful.

During 1991, petitioner purchased, for $4,500, Casablanca Sky King (Rey), a registered palomino, who at the time was 4 months old.  Rey was trained by Dow and Debbie Blumberg and showed well and won ribbons as a yearling and 2-year old until he developed a leg problem and irregularity in his gait during 1992. Unable to show Rey, petitioner decided to develop him for stud service, which could begin during his fourth or fifth year. Although he would have been more valuable in that role if he could have been shown, his bloodlines were still good, and it was hoped that he would be successful in the breeding activity.  Rey did prove to be a successful stud with five offspring, two of which are of good quality.  Petitioner's goal was to show successfully Rey's progeny to promote his bloodline and improve

petitioner's potential for income.  As of the time of trial (1998), petitioner was selling Rey's stud service for a low price ($900) as a loss leader to generate more interest in the horse. A stud may be capable of breeding for more than 20 years.

During 1993, petitioner purchased Jolly Berry, a mare, for $8,000.  Jolly Berry's former owner was unsuccessful in attempting to show her.  Ultimately, Jolly Berry produced two foals, Princess during 1994 and Skylark during 1995, and petitioner continues to own all three horses.  Princess was sired by a horse not owned by petitioner, and she was shown in a 1994 show.  Princess has good conformation and bloodlines, but little talent, and petitioner decided to use her as a replacement brood mare for Princess' mother, Jolly Berry.  Skylark was sired by Rey.  As of 1998, petitioner was preparing Skylark for sale in the $3,500 to $4,500 price range.  After two successful foals, Jolly Berry lost a foal and then incurred liver problems, resulting in petitioner's inability to recoup her $8,000 investment.

During 1993, petitioner purchased, for $3,800, the mare Fairy Dust, which produced a foal by Rey, called Bandit.  Fairy Dust was from an excellent bloodline, and she was obtained for a very favorable price at a distress-type sale.  Also in 1993, petitioner purchased the mare Trigger Happy for $2,200 and a

gelding named Defy for $1,100.  The stated purpose for purchasing Defy was for resale.

Petitioner believed that Bandit, a 3-year old during 1998, had the potential to be a very successful stud horse.  He had won the title of Reserve Champion of the California Futurity, a Statewide ranking.  Petitioner intends to exploit Bandit first as a show horse and then to earn income from his stud service.

Petitioner began with a single horse in 1989, and by 1998 she had 10 horses and 1 that she expected to be a profitable champion.  Petitioner set annual goals that were not achieved, but she would analyze her situation when resetting goals.

Although capable of personally doing so, petitioner always hired professionals to show her horses to achieve the best results and maximum exposure for her animals.  Petitioner made efforts to advertise her animals at shows, in magazines, and within various associations.  Petitioner did not prepare any profit projections prior to commencing the horse activity.  Petitioner does not keep all of her horses on her property, and some are kept on an acquaintance's property near Julian, California.  Petitioner maintains a trailer on the Julian property to reside in when she is tending the horses there.

For the years 1989 through 1995, petitioner reported income and expenses and claimed losses from her horse activity as follows:

| Year | Expenses | Income | Losses |
|------|----------|--------|--------|
| 1989 | $7,025 | -0- | $7,025 |
| 1990 | 12,838 | $305 | 12,533 |
| 1991 | 12,994 | -0- | 12,994 |
| 1992 | 19,667 | 447 | 19,220 |
| 1993 | [1]21,531 | -0- | 21,531 |
| 1994 | 26,876 | -0- | 26,876 |
| 1995 | 31,322 | -0- | 31,322 |
| Totals | $132,253 | $752 | $131,501 |

[1] On her tax return, petitioner reported $21,531 of expenses and income of $10,402 for a net of $11,129. The parties, however, stipulated that petitioner had no gross receipts from the horse activity in 1993. Accordingly, for purposes of our analysis, we assume that petitioner's claimed expenses and losses are the same.

Petitioner did not maintain a separate bank account for her horse activity, but she did keep separate records for each horse. In order to distinguish expenditures for her horse activity from others, she marked an "H" on those checks written for the activity. In addition, horse activity invoices or bills underlying each check expenditure were kept separately for each horse and accumulated and maintained on a monthly basis.

The annual specific records for each horse contained information regarding pedigree, pictures and information about the sire and dam, medical history, pictures of the specific horse, breeding information, medical information, insurance information, and training records. Petitioner also maintained numerous specific-topic horse activity files containing such information and documents as: Forms, horses for sale, health tips, boarding and training information, equipment information,

horse-related articles, association membership, etc.  During the period 1988 through 1996, petitioner belonged to 11 different organizations related to her horse activity, and she maintained a relatively large library of books and video tapes concerning training and breeding of horses and related subjects.  Petitioner also maintains at least 27 catalogs and 11 directories for various horse organizations and activities.

Petitioner usually sought an extension to file her Federal income tax return and submitted a remittance with her application to extend.  Petitioner's tax returns were filed after the extended deadline in each of the taxable years in issue.  During 1991-92, petitioner's mother, who had Alzheimer's and Parkinson's disease, lived with petitioner.  Petitioner, to a great extent, shouldered the physical responsibility of caring for her mother, and the time devoted to her mother put pressure on her ability to service her legal clients, manage her horse activity, and attend to her personal life.  During the time her mother resided with petitioner, petitioner's life was complicated, and her personal matters were in a state of disarray.  Petitioner's mother died during 1993.

Petitioner failed to timely file her 1986 and 1988 through 1992 Federal income tax returns.  The following schedule reflects the chronology of her tax return filings, including the extended dates for filing:

|        |                | Time to File   |
|--------|----------------|----------------|
| Year   | Date Filed     | Extended Until |
| 1986   | Jan. 18, 1994  | Aug. 15, 1987  |
| 1988   | June 22, 1994  | Aug. 15, 1989  |
| 1989   | Mar. 1, 1994   | Aug. 15, 1990  |
| 1990   | July 25, 1994  | Aug. 15, 1991  |
| 1991   | Nov. 19, 1993  | Aug. 15, 1992  |
| 1992   | Sept. 10, 1993 | Aug. 15, 1993  |

For her taxable years 1986, 1990, and 1991, respondent determined that petitioner had unreported income from her law practice in the amounts of $6,872, $15,499, and $22,410, respectively. Respondent conceded $7,400 of the $15,499 unreported gross receipts adjustment for 1990 and $5,080 of the $22,410 unreported gross receipts adjustment for 1991. Respondent's determination of unreported income was based on a bank deposits analysis of petitioner's bank accounts. During the audit examination, petitioner told respondent's agent that petitioner did not have any cash on hand as of the year 1986. Petitioner maintained the following types of bank accounts: Personal, general business (for law practice), trust (ostensibly for client's funds), and payroll (for law practice). Petitioner's total deposits to each of the four accounts were as follows:

|      |            | General    |          |            |
|------|------------|------------|----------|------------|
| Year | Personal   | Business   | Trust    | Payroll    |
| 1986 | $17,183.51 | $60,351.00 | $1,043   | $12,457.17 |
| 1990 | 3,740.30   | 89,175.13  | 100,318  | 8,474.44   |
| 1991 | 1,759.04   | 96,366.00  | 60       | 7,236.70   |

Petitioner had unreported income in the amounts of $6,872, $8,099, and $17,330 for the taxable years 1986, 1990, and 1991, respectively.

For the years 1986 and 1988 through 1995, petitioner reported net profit or (net loss) from her practice of law, without considering the unreported amounts decided above, as follows:

| Year | Net Profit or (Loss) |
|------|----------------------|
| 1986 | $15,914 |
| 1988 | 24,131 |
| 1989 | 35,562 |
| 1990 | 11,594 |
| 1991 | 22,160 |
| 1992 | 31,247 |
| 1993 | 12,444 |
| 1994 | 6,262 |
| 1995 | (38,571) |

OPINION

The three issues remaining for our consideration are: Whether petitioner's horse activity was not for profit in any of the taxable years before the Court; whether petitioner's income from her law practice was understated for 3 taxable years; and whether petitioner is liable for an addition to tax for late filing in any of the taxable years before the Court. We address each issue separately.

Horse activity--for profit? Section 183(a) provides that individual taxpayers will not be allowed deductions that are attributable to an "activity * * * not engaged in for profit".

This terminology is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 [trade or business] or under paragraph (1) or (2) of section 212 [expenses incurred for the production of income]." Section 183(b) permits deductions that would be allowable only if the activity were engaged in for profit, but such deductions may be taken only to the extent that any gross income generated from the activity exceeds deductions that are not dependent upon a profit objective (e.g., State and local taxes under section 164).

Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity or continued the activity with the actual and honest objective of making a profit. See Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. In making this determination, more weight is accorded to objective facts than to the taxpayer's statement of intent. See Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(a), Income Tax Regs. Petitioner bears the burden of proving that she possessed the required profit objective. See Rule 142(a); Dreicer v. Commissioner, supra; Golanty v. Commissioner, 72 T.C. 411, 426

(1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

In determining whether an activity is engaged in for profit, reference is made to objective standards, taking into account all of the facts and circumstances of each case. See sec. 1.183-2(a), Income Tax Regs. The regulations set forth nine criteria normally considered for this purpose. The factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, that are earned; (8) the financial status of the taxpayer; and (9) the presence of elements of personal pleasure or recreation. See sec. 1.183-2(b), Income Tax Regs. None of these factors is determinative, nor is the decision to be made by comparing the number of factors that weigh in the taxpayer's favor with the number that support the Commissioner. See id.

Petitioner contends that she had the requisite profit objective with respect to her horse-breeding and showing activity. Conversely, respondent contends that the activity was

not engaged in for profit. We agree with respondent. Petitioner, who from early childhood was involved with horses, decided that her ability to practice law was diminishing and that it was necessary to find some other source of income. Because she was beginning to experience memory loss, petitioner decided that the horse-related activity would be more apropos. Beginning about 1986, she investigated the potential to earn income from horse-related activity. Petitioner visited horse farms, read magazines and reference materials, and consulted farriers concerning the operation of horse activities. After completing her research, in 1989 petitioner commenced her horse activity.

Based on her research, she set the goal of acquiring a champion stallion for the purpose of selling its stud services. Her goal was to be accomplished by either purchasing or breeding champion stallions. After acquiring stallions, they were to be shown and publicized to build a high quality reputation. She projected that once the stallion attained some recognition, the stud service fees would provide a stream of income. She stated that a champion stallion could produce from $100,000 to $300,000 in stud fees and that merely showing horses would not provide sufficient income to recoup the costs of acquiring, maintaining, showing, and training horses. Petitioner chose a particular type and breed of horse and sought out a particular bloodline for acquisition. Petitioner, who possessed a considerable background

in and experience with horses, hired others with expertise for buying, training, and showing her animals. She knew that in order to be successful, she would have to acquire and/or breed championship quality stock.

Her first acquisition of mares and attempts at quality offspring did not work out due to circumstances beyond petitioner's control. She continued to make new acquisitions of breeding stock and had others train and show her horses. Petitioner, however, also purchased horses that did not comport with her goal of producing a champion stallion during the period under consideration. In fact, at the time of trial she had about 10 horses, only a few of which had the potential to be or to produce a champion stallion. Petitioner did not attempt to cut her overhead or losses by either ridding herself of unproductive horses or limiting her acquisitions to horses that would assist in a profit-oriented goal.

Petitioner testified that her overall approach was directed toward the achievement of an income stream; however, she experienced practically no income during the 9-year period from 1989 through 1998 and did little to cut her expenses/losses. Even though petitioner believed that one of her young stallions had the potential to recoup more than the $131,000 in incurred expenses/losses, no independent or reliable evidence was supplied to show that her stallion's potential or any stallion's potential

would result in a sufficient amount of profit to overcome petitioner's losses. We note that petitioner, at the time of trial, was offering one of her stallion's stud service for $900, but she made no showing of an existing or potential income flow or means to achieve a profit.

Petitioner did not maintain a separate checking account or prepare financial statements for her horse activity, but she did maintain detailed records of the breeding, maintenance, and health status of each horse. In addition, each check issued for horse-related activity was marked or referenced for that purpose and maintained and segregated on a monthly basis. Petitioner was able to substantiate her horse activity expenditures, and the only question before the Court is whether petitioner's horse activity was a for-profit activity.

Although we can accept the precept that horse breeding necessarily includes a startup period, petitioner provided no explanation as to why she was not able to earn some income or cut losses for such an extended period of time. Petitioner generally worked toward the goal of someday making a profit, but based on the record she did not attempt in earnest to achieve that goal prior to or during the years in issue. From 1989 through the time when petitioner believed she had produced a stallion with championship potential (1995), petitioner had claimed $132,253 in

expenses and reported $752[5] in income, for a net loss from all operations of $131,501. She has not shown that her projections for income were reasonable in relation to her investment.

In the setting of this case, petitioner's actions did not reflect a profit-seeking objective. Instead, petitioner offset or sheltered her law practice income by her losses from the horse activity. It may have been petitioner's intent to pursue her horse activity in a businesslike manner when her law practice ceased or declined, but that had not yet occurred as of or during the years in issue.

Finally, it is obvious that petitioner sought involvement in horse activity because of her affinity for and background involving horses. We hold that, for the 1989 through 1992 taxable years, petitioner did not enter into and\or continue the horse activity with an actual and honest objective of making a profit.

Petitioner's income from her law practice--was it understated? Respondent, based on a bank deposit analysis, determined that petitioner had unreported income from her law practice in the amounts of $6,872, $15,499, and $22,410 for 1986,

---

[5] Petitioner had amended her 1994 income tax return to reflect $20,000 in income from her horse activity. At trial, however, it was unclear whether petitioner had actually received the $20,000 in connection with her horse activity. In either event, petitioner's comparative figures are similar.

1990, and 1991, respectively.  Subsequently, respondent conceded $7,400 of the $15,499 unreported gross receipts adjustment for 1990 and $5,080 of the $22,410 unreported gross receipts adjustment for 1991.

It is well established that respondent may utilize indirect methods of reconstructing a taxpayer's income.  Where a taxpayer fails to provide adequate records, an indirect method may be used to reconstruct income.  See Holland v. United States, 348 U.S. 121 (1954).  Respondent used the bank deposits method to reconstruct petitioner's income.  The bank deposits method has been approved as an indirect method with which to reconstruct income.  See United States v. Carter, 721 F.2d 1514, 1538 (11th Cir. 1984) (citing United States v. Boulet, 577 F.2d 1165 (5th Cir. 1978)); Holland v. United States, supra.  Petitioner must show by a preponderance of the evidence that respondent's determination is erroneous.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Webb v. Commissioner, 394 F.2d 366, 372 (5th Cir. 1968), affg. T.C. Memo. 1966-81.

Petitioner did not offer records of her law practice or a methodology that would more clearly reflect income than the bank deposits reconstruction used by respondent.  In addition, petitioner does not question respondent's approach or methodology in reconstructing her income by means of the bank deposits method.  Instead, she contends that some of the deposits that

respondent determined were sourced in receipts or income from her law practice were from a nontaxable source. Petitioner testified that in 1977 she received $60,000 as proceeds of a life insurance policy in connection with her husband's October 1976 death. She further testified that she kept the $60,000 in a safe and used it during 1986, 1990, and/or 1991 by making the deposits that respondent considers unexplained and determined to be sourced in petitioner's law practice.

Respondent emphasizes that petitioner told respondent's examiner that there was no cash on hand as of the beginning of 1986. In the same vein, although petitioner contends that insurance proceeds represented a cash hoard that could explain a nontaxable source for the deposits, she testified as follows:

> Oh, yes. I wanted to mention about my husband dying in '76. I was flabbergasted when I discovered that, purportedly, there was income that I had not reported.
>
> And the only thing I can say is that somehow I spent $60,000 between about 1977 and '87.

In addition, petitioner, in showing that she was not offsetting her losses from her horse activity against her legal income, explained that she had to borrow money to buy horses and pay expenses of her horse activity. Petitioner's borrowing at a time when she purportedly possessed $60,000 in cash does not support her claim that the alleged cash hoard existed 10 or more years after she received it.

We hold that petitioner's explanation of a cash hoard (nontaxable source) is not credible and is insufficient to show that respondent's determination of unreported income is in error. Accordingly, respondent's determination, after concessions, is sustained.

Is petitioner liable for additions to tax for filing delinquent returns (section 6651(a)(1)) for the 1986, 1989, 1990, 1991, and 1992 taxable years? Respondent determined that petitioner is liable for the additions to tax under section 6651(a)(1) for her failure to timely file Federal income tax returns. Section 6651(a)(1) provides for an addition to tax of 5 percent of the tax required to be shown on the return for each month or fraction thereof for which there is a failure to file, not to exceed 25 percent. The addition to tax for failure to file a timely return is imposed unless the taxpayer shows that the delay was due to reasonable cause and not willful neglect. See sec. 6651(a)(1); United States v. Boyle, 469 U.S. 241, 245 (1985). A failure to file is due to "reasonable cause" if the taxpayer exercised ordinary business care and prudence and was, nevertheless, unable to file the return within the time prescribed by law. See United States v. Boyle, supra at 246.

Petitioner contends that the difficulties in her life, including her mother's illness and her obligations as a solo practitioner of law, caused turmoil in her life and constitute a

reasonable cause for failing timely to file. In each instance, petitioner filed for an extension to file, but failed to file before the extended time. Petitioner was aware of her filing obligations, and, as a lawyer, it would be difficult for her to claim otherwise. In spite of her personal difficulties, she was able to conduct her law practice and horse activity. Although we can agree that petitioner experienced hardships and had much responsibility, we are unable to find that she had reasonable cause for failing to timely file. In similar situations of deaths in the family, e.g., <u>Radde v. Commissioner</u>, T.C. Memo. 1997-490, and the press of work of a solo practitioner/doctor, <u>Polsby v. Commissioner</u>, T.C. Memo. 1998-459, we have held that the delinquency addition or penalty can apply. Petitioner here is no different. Petitioner's failure-to-file pattern was lengthy and consistent and preceded and continued after the difficulties presented by petitioner's mother's condition and death. Accordingly, we sustain respondent's determination that petitioner is liable for the additions to tax under section 6651(a)(1) for the years determined.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155.</u>