T.C. Summary Opinion 2004-103

UNITED STATES TAX COURT

RANDALL B. AND KAY F. OLLETT, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7096-03S.                    Filed July 28, 2004.

Randall B. and Kay F. Ollett, pro sese.

Jason W. Anderson, for respondent.

WOLFE, Special Trial Judge:  This case was heard pursuant to
the provisions of section 7463 of the Internal Revenue Code in
effect when the petition was filed.  Unless otherwise indicated,
all subsequent section references are to the Internal Revenue
Code in effect for the years in issue, and all Rule references
are to the Tax Court Rules of Practice and Procedure.  The
decision to be entered is not reviewable by any other court, and
this opinion should not be cited as authority.

Respondent determined deficiencies in petitioners' Federal income taxes in the amount of $6,178 for 1999 and $7,940 for 2000. The issue for decision is whether petitioners engaged in their Amway/Quixtar activity during 1999 and 2000 with the objective of making a profit within the meaning of section 183.

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. When they filed their petition, petitioners resided in St. Charles, Illinois.

Petitioners filed joint Federal income tax returns for 1999 and 2000. At all relevant times, petitioner Randall Ollett (petitioner) was employed as a computer data security manager by the American Medical Association in Chicago, Illinois. He typically worked at this employment between 45 and 50 hours each week and spent an additional 12 to 20 hours each week commuting to and from work. Petitioner Kay Ollett (Mrs. Ollett) worked approximately 30 hours each week as a preschool teacher at Evangelical Covenant Church. Petitioners reported combined wages of $96,389 in 1999 and $98,949 in 2000.

Petitioner graduated from Princeton University with a bachelor of science degree in electrical engineering, and he has a master's degree in business administration from Lamar

University in Beaumont, Texas, now part of the University of Texas.

In October 1996, petitioners began to operate an Amway distributorship under the name of Ollett Enterprises. Amway is a supplier of household and personal use products sold by direct marketing. Petitioners were recruited into Amway by their so-called upline sponsors, David and Carole Marzke.[1] In the Amway pyramidal sales structure, petitioners and the Marzkes are ultimately members of the large network established by Bill Florence (the Florence organization).

Neither of the petitioners had any sales experience prior to joining Amway. Petitioners did not write a business plan or establish a budget and did not consult with any business advisers other than their Amway uplines concerning techniques for making their distributorship profitable.

Around late 1999 or early 2000, Amway changed its name to Alticor Inc., and petitioners became an "independent business owner" (IBO) of Quixtar, a wholly owned subsidiary of Alticor. Amway's restructuring had no significant impact on the Federal

---

[1] "Upline" and "downline" refer to a distributor's position within the Amway network. Distributors are generally recruited into Amway by a sponsoring distributor. The sponsoring distributor is considered the "upline" distributor and his recruits are "downline". As downline distributors recruit additional distributors, those recruits also become members of the original sponsor's downline network.

tax consequences of petitioners' activity.[2]  For simplicity and consistency, we generally refer to petitioners as an Amway distributorship rather than as a Quixtar IBO.

An Amway distributor earns income by selling products and recruiting new downline distributors.  Under Amway's compensation system, a distributor earns a "performance bonus" based not only on the sales volume generated by the distributor himself but also on the sales volume generated by the distributor's downline network.[3]  Generally, distributors earning large performance bonuses have developed a large and broad network of downline distributors.

Petitioners focused their efforts upon building their downline network rather than developing a customer base and

---

[2]  According to petitioners, the primary change that resulted from Amway's restructuring was that Quixtar expanded the range of items available for sale to customers to include many commonly used household and personal products not manufactured by Amway, and its Internet-based sales system eliminated the need for petitioners and other distributors to warehouse products. Petitioners' compensation did not change, as they received credit for any products ordered online through their distributor number just as they previously had received credit for items ordered through them or their downline distributors.

[3]  To calculate the performance bonus, Amway uses a "performance bonus schedule" based upon a distributor's "business value" (BV) and "point value" (PV).  BV is a dollar amount assigned to each product.  BV is used for the calculation of monthly and annual bonuses.  PV is a unit amount assigned to each product.  PV determines the distributor's performance bonus bracket.  If the PV is high, because of high unit sales by the distributor and his downlines, that distributor will receive a correspondingly high performance bonus in the form of a high percentage of his BV.

selling products. Petitioners spent approximately 15 to 20 hours weekly "prospecting, contacting, and showing the plan, and attending local meetings". In 1999-2000, petitioners had approximately 5 downline distributors. Petitioners believed the key to succeeding in Amway was "to meet [people] * * * and get them into this business" and that "the profit comes when you have enough people, when you've registered enough people".

Mrs. Ollett testified that she would prepare sample baskets and regularly spoke with customers and prospects about ordering Amway products, but petitioners admit that approximately 70-75 percent of their sales were from products purchased by them for their own personal use. The Olletts purchased most of their ordinary household products through their distributorship, including soap, shampoo, deodorant, dish-washing liquid, detergent, facial products, food items such as health food bars and energy drinks, a water treatment system, and clothing such as men's socks, slacks, and sport shirts.[4]

Between 1996 and 2000 petitioners reported the following losses from their Amway distributorship on Schedule C, Profit or

---

[4] As Mrs. Ollett put it: "I'm not going to give Wal-Mart -- make Ms. Wal-Mart wealthy when I can buy it from myself. It's my store. I wouldn't buy it from anywhere else."

Loss From Business:

| Year | Gross Income | Total Expenses | Net Losses |
|------|-------------|----------------|------------|
| 1996 | $10 | ($1,625) | ($1,615) |
| 1997 | 357 | (13,177) | (12,820) |
| 1998 | 625 | (17,504) | (16,879) |
| 1999 | 1,450 | (17,384) | (15,934) |
| 2000 | 3,235 | (23,001) | (19,766) |
| Total | 5,677 | (72,691) | (67,014) |

The parties also stipulated that petitioners reported continuing losses from their Amway distributorship on their tax returns for 2001 and 2002.

For the years in issue petitioners' expenses from their Amway activity were as follows:

|  | 1999 | 2000 |
|------|------|------|
| **Expenses** | | |
| Advertising | $514 | $290 |
| Car and truck expenses | 6,618 | 8,504 |
| Depreciation expenses | 55 | 351 |
| Office expenses | 1,609 | 1,102 |
| Supplies | 0 | 4,408 |
| Travel | 2,878 | 2,831 |
| Meals/entertainment | 817 | 1,111 |
| Utilities | 1,322 | 3,598 |
| Other Expenses | | |
| Books and training aids | 3,571 | 96 |
| Professional membership | 0 | 710 |
| Total | 17,384 | 23,001 |

A substantial portion of petitioners' Amway expenses was incurred in their traveling to various locations throughout the country to attend meetings and seminars hosted by the Florence organization.  Petitioner generally described these meetings as training functions that petitioners attended to learn techniques for building a successful network from instruction by his upline

distributors.  Since Mrs. Ollett does not like to fly, petitioners purchased a used 1992 Cadillac Deville in 1999 for about $6,000 and drove to these functions.  Petitioners generally deducted car expenses, hotel and meal expenses, and the cost of tickets to attend the events.  The attendees at these conferences fluctuated but generally included many of the same people.

In 1999, petitioners attended the following seminars and conferences sponsored by the Florence organization:  Dream Weekend in Birmingham, Alabama, from December 31, 1998, to January 3, 1999; Florence Spring Leadership conference in Chattanooga, Tennessee, from March 12-14; Weekend of the Diamonds in Charlotte, North Carolina, from May 21-23; Florence Family Reunion in Tampa City, Florida, from July 2-4; a training on cosmetics sponsored by Florence Enterprises from July 30 to August 1 in Columbia, South Carolina; a free enterprise celebration in St. Louis, Missouri, from September 3-5; and Florence Fall Leadership conference in Knoxville, Tennessee, from November 19-21.

In addition, petitioners claimed travel-related expenses in 1999 for several out-of-town trips purportedly made to "show the plan" to prospective recruits, but which had significant personal motivations.  Petitioners did not recruit any downlines during any of these out-of-town trips.

Petitioners continued their allegedly business-related travel in 2000. During 2000 they traveled to Atlanta, Georgia, from January 14-16; Knoxville, Tennessee, from March 3-5; Greensboro, North Carolina, from May 5-7; a Renaissance hotel at an unspecified location from June 30 through July 2; Columbia, South Carolina, from July 22-23; and Atlanta from November 4-5.

In addition to the travel-related expenses, petitioners also had expenses of $3,571 in 1999 and $710 in 2000 for professional books and other materials that were part of Amway's "training program". These books were recommended by petitioners' upline network and may be described as general self-motivation books. Petitioners also purchased various audio tapes that included stories told by other Amway distributors of how they built successful networks.

As noted above, petitioners' revenue from the Amway activity for the years in issue was minimal, and even that amount was attributable in part to petitioners' purchases of household goods for their own personal use. When asked about how they intended to turn their losses into profits, Mr. Ollett responded: "The only way I can solve it is to talk to more people. And there, in essence, is the challenge that I have, which is finding those people".

## Discussion

In general, a taxpayer bears the burden of proving his entitlement to a business expense deduction. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Burrus v. Commissioner, T.C. Memo. 2003-285. Section 7491(a) provides that the burden of proof shifts to respondent under certain specified conditions. Petitioners have not established that the burden of proof has shifted, and in any event the resolution of this case does not depend upon the burden of proof.

The deductibility of a taxpayer's expenses attributable to an income-producing activity depends upon whether that activity was engaged in for profit. See secs. 162, 183, 212. Section 162 provides that a taxpayer who is carrying on a trade or business may deduct ordinary and necessary expenses incurred in connection with the operation of the business. Section 212 provides a deduction for expenses paid or incurred in connection with an activity engaged in for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income. Section 183 specifically precludes deductions for activities "not engaged in for profit" except to the extent of the gross income derived from such activities. Sec. 183(a) and (b)(2).

For a taxpayer's expenses in an activity to be deductible under section 162 or section 212, and not subject to the

limitations of section 183, the taxpayer must show that he engaged in the activity with an actual and honest objective of making a profit.  Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Lopez v. Commissioner, T.C. Memo. 2003-142.  Although a reasonable expectation of a profit is not required, the taxpayer's profit objective must be "actual and honest".  Dreicer v. Commissioner, supra at 645; sec. 1.183-2(a), Income Tax Regs.  Whether a taxpayer has an actual and honest profit objective is a question of fact to be resolved from all the relevant facts and circumstances.  Keanini v. Commissioner, supra at 46; Lopez v. Commissioner, supra; sec. 1.183-2(a), Income Tax Regs.  Greater weight is given to objective facts than to a taxpayer's statement of intent. Keanini v. Commissioner, supra at 46; Dreicer v. Commissioner, supra at 645; sec. 1.183-2(a), Income Tax Regs.  As stated earlier, the taxpayer bears the burden of establishing the requisite profit objective.  Rule 142(a); Keanini v. Commissioner, supra at 46; Lopez v. Commissioner, supra.

Regulations promulgated under section 183 provide the following nonexclusive list of factors which normally should be considered in determining whether an activity was engaged in for profit:  (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3)

the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.  Sec. 1.183-2(b), Income Tax Regs.

No single factor, nor the existence of even a majority of the factors, is controlling, but rather it is an evaluation of all the facts and circumstances in the case, taken as a whole, that is determinative.  Golanty v. Commissioner, 72 T.C. 411, 426-27 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b), Income Tax Regs.

After careful consideration of all facts and circumstances presented in this case, we conclude that petitioners did not have an actual and honest objective of making a profit from their Amway distributorship.

Petitioners did not have any sales experience prior to becoming Amway distributors.  Petitioners relied exclusively on their upline distributors, who stood to benefit from petitioners' participation, for advice and training.  They did not seek independent business advice at the beginning of their Amway

activity to assess their potential for success, and they did not seek independent business advice for turning around years of operating losses.  Petitioners' failure to seek independent business advice strongly suggests that petitioners did not carry on the Amway distributorship in a businesslike manner.

Petitioners did not write a business plan, and, although they kept track of expenses, they never established a budget. Petitioner testified not only that they did not set up a budget, but that by 1999 they had decided they were going to spend "whatever it took to go to those meetings".  Petitioners did keep receipts and detailed records, but apparently more for substantiation purposes than as a tool for analyzing and improving their business.  See Lopez v. Commissioner, supra; Hart v. Commissioner, T.C. Memo. 1995-55.

Petitioners' Amway activity resulted in a substantial and sustained pattern of losses.  Between 1996 and 2000, the activity produced very little income, and most of petitioners' sales were for their own use.  Yet petitioners continued to incur significant expenses, largely for automobile costs and other travel-related expenses for attending out-of-town seminars. Losses incurred in the initial stages of a business may be expected, but losses that continue without explanation beyond that period typically required for an activity to become profitable may indicate the lack of a profit objective.  See

Golanty v. Commissioner, supra at 427; Nissley v. Commissioner, T.C. Memo. 2000-178. Seemingly, petitioners' only plan to reverse the years of losses always was based on the premise that their people and sales skills would improve and that they would be able to persuade other downline distributors to join their network.

Petitioners maintained their respective employments during the years in issue. Petitioners worked approximately 87 to 100 hours per week at their respective jobs, and spent only 15 to 20 hours per week on Amway. From their employment, petitioners reported wages of $96,389 in 1999 and $98,949 in 2000. Petitioners were able to use the losses from their Amway activity to offset income earned from their employment.

We believe petitioners received enjoyment from the Amway activity, and we cannot overlook the personal and social aspects of their trips for which they claimed significant travel expenses. They regularly used Amway activities as a device to deduct personal expenses as business expenses. For example, on two occasions, around March 26 and August 22, 1999, petitioners drove to Champaign, Illinois, where their daughter was attending the University of Illinois. On the August 22 trip, petitioner drove his daughter to school for the start of the fall semester. He explained: "The fact that I was going to use my business car to transport [personal] effects down there meant I made sure that

I would have somebody to show the plan to".  During the Thanksgiving holiday, from November 25-28, 1999, petitioners drove to Chattanooga, Tennessee, where petitioner's parents live. Again, petitioner stated:  "Because I used my business car, I made sure that I prospected and tried to--made contacts with people in Chattanooga".  Petitioners did not recruit any downline distributors on these trips, and there is no evidence that they sold any Amway products on these trips.  They simply made a few perfunctory calls on unresponsive individuals and claimed deductions for the personal trip.

At the Amway conferences, petitioners repeatedly met with many of the same people from the Florence organization, and many of those trips occurred during holiday weekends such as the New Year and the Fourth of July.  Petitioners testified that the purpose of the Amway conferences was training, but they did not explain why they felt it was necessary to attend so many training seminars during their third and fourth years into their Amway activity.

Petitioners repeatedly used their Amway activity as an attempt to mask obviously personal expenses as deductible business expenses.  In effect they attempted to live a deductible lifestyle.  The conferences at times of the year associated with vacation and recreation are consistent with this same mindset. Most importantly, petitioners reported no significant revenue

from their Amway activity and no reason for them to believe they ever were going to have significant revenue from this activity.

Petitioner testified that he joined Amway with a profit motive, and he may have had that subjective intent initially. However, as previously stated, more weight must be given to objective facts indicating a profit objective than to petitioners' subjective intent. Because of the manner in which petitioners carried on their Amway activity, the lack of revenue, and the size and persistence of the continuing losses, we hold that petitioners' Amway activity during the years in issue was not carried on for profit within the meaning of section 183, and petitioners are not permitted to deduct their losses from that activity.

Reviewed and adopted as the report of the Small Tax Case Division.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.